**2025 UT App 26**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ADAM JAY MOORE,
Appellant.

Opinion
No. 20220410-CA
Filed February 27, 2025

Fourth District Court, Provo Department
The Honorable Thomas Low
No. 191402823

Emily Adams, Freyja Johnson, and Cherise Bacalski,
Attorneys for Appellant, assisted by law students
Wyatt Allred, Anne Carmack, and Danna Radford[1]

Derek E. Brown and Karen A. Klucznik,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES JOHN D. LUTHY and AMY J. OLIVER concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     Adam Jay Moore was convicted of several crimes stemming from his physical and sexual abuse of the young children of a close friend. Moore argues that, in several instances, his trial counsel (Counsel) rendered ineffective assistance. He argues that these failures, both taken separately and together, merit a reversal of his convictions. We disagree and affirm.

---

1. *See* Utah R. Jud. Admin. 14-807 (governing law student practice in the courts of Utah).

BACKGROUND

¶2      Siblings Emma, Ivy, and Josh[2] (collectively, the children) spent their early years living with their biological parents (Biological Mother and Biological Father). The family lived for a few years in a house in Orem, Utah (the Orem house), that Biological Father's mother (Grandmother) bought for them to "rent-to-own." They lived in this house with Biological Father's two brothers and their wives. There was also an extra bedroom that they "rented out to friends." In 2012 or 2013, the family left the Orem house and lived in "several" other locations, including, at one point, in an apartment from which Moore—a close friend of Biological Father—was moving.

¶3      At some point in 2014, Biological Mother decided she wanted "to get clean off of drugs" and left the family, planning to enter a rehabilitation program. But before she entered the program, she asked Biological Father to bring the children to the hotel where she was staying for a visit. Biological Father did so, but he also arrived with "drugs on him." Biological Mother "relapsed" that night, and the police were eventually called to the hotel. They removed the children from their parents' care and placed them with Grandmother. The children stayed with Grandmother for about a year, at which point they moved to live with the couple who would shortly thereafter become their adoptive parents. At the time of their adoption, Emma was nine years old, Ivy was seven years old, and Josh was five years old.

¶4      About four years later, Emma, who suffered from depression, had to be hospitalized after a suicide attempt. On the last morning of her hospitalization, Emma called her adoptive mother (Mother) and told her that "she remembered being raped" when she was younger. She said that "she couldn't see the face of the person who had done it" but thought "it possibly could have

_____

2. We use pseudonyms for the children involved.

been her uncle." On the way home from the hospital later that day, however, Emma told Mother that she remembered who raped her and that his picture was in the children's scrapbooks. At home, Emma began looking through the scrapbooks to try to locate the man's picture. During this time, she told Mother that she remembered her "food being drugged and feeling funny" and that she remembered the man had touched her "down there," pointing toward her genital area. When she came to a picture of Moore, Emma said, "It's him."

¶5     When Ivy and Josh came home from school, Mother spoke with Ivy alone, showing her the picture of Moore and asking if she knew who he was. Ivy said that she did; she revealed that he "was mean" and that he had hurt the children and "touched down there." Mother then spoke with Josh separately, also showing him the picture of Moore and asking him if he knew who it was in the photograph. Josh "immediately . . . tensed up," and he responded that he did not know who the man was but that he felt like "he's a bad man."

¶6     Mother reached out to Biological Mother, who identified the man in the photo as Moore. Mother also contacted the authorities, which led to Emma and Ivy being interviewed at the Children's Justice Center (the CJC).

¶7     During Emma's interview, she stated that Moore had abused the children "sexually and physically and emotionally," including by "put[ting] himself inside of [her] once." She also claimed that Moore would "put alcohol in [their] sippy cups [and] drugs in [their] pancakes," that he would "pick [them] up by [their] throats and throw [them] across the room," and that he would "make [them] watch things [they] didn't want to watch." Specific to the instance when she was being raped by Moore, she stated, "[M]y dad came in and [Moore] just stopped, pulled up his pants, and he just left me there." As to the timing of the abuse, Emma (then twelve years old) said that the abuse started when

she was "maybe two and a half" and "kind of stopped" when the children went to live with Grandmother. And finally, at the close of her interview, Emma twice asserted that Biological Mother had told her that she herself was also raped by Moore.

¶8    Ivy's interview revealed fewer details, but she made many of the same general assertions regarding Moore's behavior: that he would grab the children "by the neck and [throw them] across the room," that he "poured alcohol in [their] sippy cups and put alcohol in [their] pancakes," and that he would "touch [them] inappropriately." Ivy stated that the abuse started when she was "four or five."

¶9    Additionally, both Emma and Ivy underwent physical exams by a sexual assault nurse examiner (Nurse). As part of that process, Nurse created an assessment form for each girl, which included medical and behavioral information relayed by Mother, as well as information from Mother and the girls regarding the alleged abuse.

¶10    When contacted by police, Moore agreed to come in for an interview with a detective (Detective). In that interview, Moore explained his close relationship with Biological Father—that "he'd known [Biological Father] for most of his life and they were best friends." Moore admitted to using drugs with Biological Mother and Biological Father but said that they only did so "away from the children" at night. Moore stated that he had a "good relationship" with the children and that they referred to him as "Uncle Adam." Detective told Moore that the children had alleged that Moore "had sexually, physically and emotionally abused them," and Moore said that "he didn't know why they would say something like that."

¶11    The State ultimately charged Moore with one count of rape of a child, five counts of aggravated sexual abuse of a child, three counts of child abuse, two counts of child endangerment, and two

counts of dealing in materials harmful to a minor. Moore pleaded not guilty, and the case proceeded to trial.

¶12    After the jury had been selected but before the State presented its case, the court heard argument regarding the State's pending motion to admit evidence regarding "victim trauma and behavior." The State argued that it should be allowed to present evidence regarding Emma's and Ivy's "change in behaviors or . . . exhibitions of trauma" because such evidence was "probative of the trauma and . . . emotional and psychological damage done in acts of child abuse" and the change in behavior was "consistent with abusive behaviors demonstrated by children." In this discussion, Counsel responded,

> I don't know that I'm even going to have an objection to it, just an addition. There was an assessment form that was done with the CJC where it talks about other behavioral issue[s] that arguably . . . could or couldn't be indicative of trauma, and I'd like that as well to come in, and then have the ability to cross-examine [Biological Mother] as to the baseline regarding . . . all of the issues that have just been brought up.

When asked specifically what he was interested in using from the CJC assessment, Counsel responded,

> So the specific things, the State's own social history, [Emma] lives with her adoptive parents and siblings, she's participating in K through 12 online homeschool due to violent issues in school. [Mother] states [Emma] is manipulative, steals, and runs away from school.
>
>     Additionally, on the form it talks about [how] she has conduct disorder, PTSD, major depressive

disorder with hallucinations, anxiety, and ADHD.
Also, in the form it talks about sexual acting out . . . .

The State conceded that because it was "going to be opening the door," the defense had "a right to question" about those "behavioral concerns," and the court ultimately granted the State's "unopposed" motion.

¶13    Thereafter, during his opening statement, Counsel referred to these behavioral concerns. After Counsel acknowledged that this "is a tragic situation" and agreed Emma and Ivy "went through sexual abuse," he argued that there were, nonetheless, many reasons to doubt their identification of Moore as the perpetrator. As one reason, Counsel specifically referenced Emma's assertion that Moore had raped Biological Mother:

> [Biological Mother] states—or never stated that she was raped by [Moore], ever. She was interviewed on it. She says that one night they were drinking, she woke up naked with him in the bed but doesn't know if anything happened. You're going to hear [Emma], the oldest child, testify that [Biological Mother] disclosed to her that she was raped by [Moore]. So then you have to ask yourself, Is there a motive here for the girls to point the finger at [Moore] and blame some of the sexual abuse on him?

Counsel asserted that Emma did not like Moore because she believed he had raped Biological Mother, and Counsel suggested that Ivy was influenced by those feelings because the girls "are sisters and talk amongst each other." Counsel also explained that during the course of the investigation, there were "disclosures made to the doctors and the interviewer" indicating that Emma "is a liar," "is a manipulator," and "has hallucinations."

¶14 Additionally, Counsel urged the jury to consider whether the details of the children's disclosures "make sense," including the assertion that "that they were with [Moore] for a week," that Moore "was so drugged out that he was just molesting them nonstop and was feeding them drugs all the time," that Biological Father "would punch Moore and give him black eyes, but they were best friends," and that Biological Father walked in on Moore raping Emma and "didn't try and stop it."

¶15 The State called Mother as its first witness. She related the events surrounding Emma's disclosure of abuse as set forth above, including Emma's initial allegation of rape, her search for the photo of her abuser in the scrapbook, and Ivy's and Josh's reactions to being shown Moore's photo. Mother also testified about some of the other things that Emma had said in the week following her disclosure: "[S]he told me that [Moore] had said that he would hurt her if she shared information about what had happened . . . . [S]he told me that she remembered biting him when he was trying to hurt her sister. She remembered being locked in a closet. I believe she disclosed also pornography. . . . That he would make them watch it."

¶16 Mother also testified that sometime after the disclosure, she and the children were on a video call with Biological Mother and Emma wanted to "tell her about the abuse." Thereafter Biological Mother "made the comment that she had been raped by [Moore]," although she offered no additional details.

¶17 Emma also testified as part of the State's case. In addition to testifying as to the sexual abuse, she stated that "[o]ne time"—between her initial disclosure and her later interview at the CJC— she had asked Biological Mother about Moore. She said that because she "wanted to see if [she] was the only one," she had asked Biological Mother "if [Moore] ever raped her." According to Emma, Biological Mother revealed that she had been raped and provided details of the event: "She said that they were hanging

out together and he drugged her and took her into a different bedroom, took advantage of her . . . ." But Emma testified that even after this disclosure, she "didn't feel comfortable telling" Biological Mother about her own abuse and chose not to say anything about it. A video recording of Emma's CJC interview was also played for the jury.

¶18 Next, Biological Mother testified. She testified as to the family's living situation during the time frame of the alleged abuse. She said that the living circumstances at that time were "really hectic to say the least." She said that there were six adults living in the Orem house as well as whoever was staying in the extra room that they rented out. She also stated that Moore would "be at the home every day" and that he would "stay there" despite having a place of his own. She explained that Biological Father and Moore were very close, "like brothers," and that Biological Father would also take the children to Moore's place "[m]aybe every other day." Biological Mother also asserted that there were multiple individuals in the Orem house abusing drugs.

¶19 As to the "incident" between herself and Moore, Biological Mother recounted that after she "lost [her] kids" and split up with Biological Father, she "went over to [Moore's] house one night and got drunk and woke up not remembering what happened." She was "concern[ed]" because when she woke up, she was naked and "covered with bruises," and she suspected something had happened to her. But she never reported anything about the incident because she could not "clarify 100 percent one way or the other" what had happened. However, Biological Mother denied ever telling Emma about this evening: "I have never once talked to my daughter about a conversation like that. She's too young to hear things like that." And on cross-examination, Biological Mother agreed that she "willingly drank with [Moore]" and acknowledged that whatever happened that night "could have been consensual" but she just could not remember.

¶20   Detective also testified about his investigation into the abuse allegations. As part of his testimony, Detective confirmed that, in her interview, Biological Mother "disclosed the incident" with Moore but "she never indicated whether she was raped or not." It was only Emma who "had said that [Biological Mother] was raped."

¶21   Ivy also testified, recounting her version of events. And the video of her CJC interview was played for the jury.

¶22   When it was her turn to testify, Grandmother gave further details regarding the children's living arrangements. Her testimony included statements that the family lived "several places" after moving out of the Orem house. She testified that one of those places was Moore's apartment: "I don't know if they lived with [Moore] but I know that they took over his apartment. . . . That's per my [son]." On cross-examination Counsel questioned whether Moore had moved out when the family moved into his apartment, to which Grandmother responded, "I can't tell you if he was living there or not. . . . No. Only that my son said [Moore]—it was [Moore's] apartment and . . . he was moving and [Biological Father and Biological Mother] moved in." Counsel followed up on the timing, asking, "So you were told that [Moore] was moving out and [Biological Father and Biological Mother] were moving in[?]" And Grandmother responded, "Right."

¶23   Nurse thereafter testified as to the physical examinations she had conducted. During discussion of Emma's and Ivy's examinations, the respective assessment forms were admitted into evidence and projected on the screen for the jury to see. Nurse walked through the components of each assessment form as she explained her examinations. She also explained that the history sections on the forms contained information collected from the caregiver and the two girls. She stated that she "tried to refer them back to the concerning incident" when collecting the history and that this information helped to guide the medical examination:

"[Y]ou have to know why they're there and what you are looking for and why you're doing that exam."

¶24 On cross-examination, Counsel asked Nurse about the several behavioral issues that were disclosed in Emma's CJC assessment form (as he had previously indicated he intended to do), specifically, that Mother had disclosed that Emma "was lying and stealing," "was manipulative," "had PTSD," had "[m]ajor depressive disorder," suffered from "hallucinations," and had "some issues with self-gratification." Nurse responded affirmatively to each inquiry.

¶25 After Nurse's testimony, the State and the defense rested, the court instructed the jury, and the parties delivered closing arguments. In his closing argument, Counsel highlighted portions of Emma's and Ivy's testimony and argued that it was fantastical, inconsistent, and incredible. He argued that although there was "no doubt" that they had experienced abuse, "the evidence ha[d] shown, an overwhelming amount, that there's major, major issues with what [Emma and Ivy were] saying."

¶26 After deliberating, the jury convicted Moore on each count. He was thereafter sentenced to various prison and jail terms. Moore now appeals.

ISSUES AND STANDARD OF REVIEW

¶27 Moore raises several claims of ineffective assistance of counsel that he argues merit reversal both individually and cumulatively. "In determining a claim of ineffective assistance of counsel raised for the first time on appeal, we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Aguirre-Juarez*, 2014 UT App 212, ¶ 6, 335 P.3d 896 (quotation simplified), *cert. denied*, 341 P.3d 253 (Utah 2014).

ANALYSIS

¶28   To prevail on an ineffective assistance of counsel claim, a defendant must show (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

¶29   As to the first prong of this test, a defendant must show that trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* "Because of the temptation to second-guess trial counsel's decisions with the benefit of hindsight, judicial scrutiny of counsel's performance must be highly deferential and courts must acknowledge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Honie v. State*, 2014 UT 19, ¶ 32, 342 P.3d 182 (quotation simplified); *see also Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."). "The defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quotation simplified).

¶30   As to the second prong of the test, a defendant must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. That is, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

¶31   "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687. Thus, a defendant's "failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim." *Honie*, 2014 UT 19, ¶ 31.

I. Evidence of the Alleged Rape of Biological Mother

¶32 Moore's first assertion of ineffective assistance concerns the evidence that Biological Mother had been raped by Moore. Both Mother and Emma testified at trial that they had heard Biological Mother state that Moore had raped her; Emma repeated that assertion in her CJC interview that was played to the jury; and Detective testified that in his interviews, Emma said Biological Mother had been raped, although Biological Mother made no such assertion in her interview. Moore argues that this evidence was "inadmissible and highly prejudicial" and that Counsel rendered ineffective assistance in failing to raise objections under a variety of legal theories: inappropriate "other acts" evidence, *see* Utah R. Evid. 404(b); irrelevant evidence, *see id.* R. 402; evidence that is more prejudicial than probative, *see id.* R. 403; and improper hearsay evidence, *see id.* R. 802.

¶33 But we agree with the State that Counsel did not perform deficiently in failing to raise such objections because, from the outset of trial, Moore made a reasonable strategic decision "to use Emma's mistaken belief that [Moore] raped Biological Mother to show a motive to falsely accuse him." "If it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance." *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871; *see also id.* ("As a general matter, we presume that an attorney performed in an objectively reasonable manner because his conduct *might* be considered part of a sound strategy. Moreover, where it is shown that a challenged action was, in fact, an adequately informed strategic choice, we heighten our presumption of objective reasonableness and presume that the attorney's decision is nearly unchallengeable." (quotation simplified)). And it is clear from Counsel's opening statement that he intended to use this information as a part of a defense strategy to attack Emma's credibility, establishing that Emma incorrectly believed Moore

had raped Biological Mother and suggesting that this belief could explain why Emma chose to blame him for her own abuse.

¶34    Moore pushes back, arguing that such a trial strategy would be unreasonable because of the timing of Emma's disclosure—Emma disclosed her abuse and identified Moore as her abuser *before* she had talked with Biological Mother and heard her allegations of rape. And Moore argues that because the timing of Emma's disclosure emerged during Mother's testimony at the outset of trial, Counsel continuing to pursue this defense strategy became unreasonable and Counsel should therefore have objected to any references to the alleged rape.[3]

¶35    But we do not see that the timing identified in Mother's testimony rendered unreasonable the continued pursuit of the original defense strategy. Immediately before Mother's testimony, Counsel had delivered his opening statement telling the jury that it would hear information about an alleged rape of Biological Mother and suggesting that this information supported the defense because Emma's belief that the rape occurred undercut her credibility.[4] Thus, Counsel could have reasonably

---

3. Moore additionally asserts that this strategy would not have been reasonable because "Emma did not like Biological Mother." Although Emma's testimony suggested some general negative feelings toward Biological Mother, it is also true that in her CJC interview, after specifically talking about Biological Mother being raped, Emma stated, "She did not tell me to do this. She actually told me not to, but I love her enough to where I—I feel like I need to." Thus, Counsel could reasonably argue that Emma's love for Biological Mother would have had an influence on her choices and actions.

4. Moore does not argue that Counsel's opening statements regarding these rape allegations were unreasonable, just his

(continued…)

been concerned about what the jury would think if he shortly thereafter began objecting every time the State tried to present this very information.

¶36    Furthermore, the timing of the disclosure did not completely destroy the utility of using the rape allegation to create reasonable doubt. Although it is true that Counsel could no longer argue that Emma *initially* identified Moore as her abuser to punish him, Counsel could still argue that any doubt Emma may have later had about singling out Moore would have been ignored once she believed that he raped Biological Mother as well. Additionally, Biological Mother's testimony that she never revealed this information to Emma conflicted with Emma's own testimony on the matter, raising further credibility questions.

¶37    We also reject Moore's argument that Counsel's strategy to use the rape allegation as part of the defense was unreasonable because the allegation "cast [him] as a sexual deviant." Counsel was careful to ensure, through his opening statement and through his questioning of Biological Mother, that the jury understood that Biological Mother had never stated she was raped by Moore and that she admitted that their interaction may have been consensual.

¶38    In sum, Counsel's decision to use evidence of Biological Mother's alleged rape was a reasonable trial strategy, and thus, Moore has not shown deficient performance, and his ineffective assistance claim fails.

## II. Hearsay

¶39    Moore next asserts that Counsel rendered ineffective assistance by failing to object to "inadmissible hearsay that improperly bolstered the allegations against [him]." He points to

---

failure to abandon the original strategy on the matter after realizing the timing issue that arose during Mother's testimony.

specific testimony given by Mother and Grandmother.[5] We address each in turn.

A.     Mother

¶40   Moore specifically attacks the portions of Mother's testimony related to Emma's initial statements regarding the abuse. Mother explained in her testimony (1) that Emma initially disclosed over the phone that "she remembered being raped" and that it "possibly could have been her uncle"; (2) that later that afternoon Emma said she could remember who raped her and that the man was pictured in their scrapbooks; (3) that while looking through the scrapbooks, Emma also related that she remembered her "food being drugged and feeling funny" and remembered that the man had touched her "down there"; and (4) that Emma said, "It's him," when she came to the picture of Moore. Mother additionally related that in the few days following the initial disclosure, Emma also stated that Moore had threatened to "hurt her if she shared information about what had happened," that "she remembered biting him when he was trying to hurt her sister," that "[s]he remembered being locked in a closet," and that Moore "would make them watch [pornography]."

¶41   We do not agree that Counsel performed deficiently in failing to lodge objections to these portions of Mother's testimony. As an initial matter, Counsel may have believed that the majority of these statements were not hearsay at all because they were not offered as proof that the assertions therein were true, but to provide context for Mother's testimony and explain why she had been searching with Emma through the scrapbooks, why she

---

5. In his opening brief, Moore also advanced an argument regarding hearsay in Emma's testimony as well. However, he withdrew this particular argument in his reply brief, and we therefore do not analyze this claim.

reached out to Biological Mother to identify the man in the photograph, and why she contacted the authorities. *See generally* Utah R. Evid. 801(c) (providing that to be hearsay, a statement must be one that "a party offers in evidence to prove the truth of the matter asserted in the statement").

¶42 As to the remaining statements, even if such statements could be considered inadmissible hearsay, it does not necessarily follow that Counsel performed deficiently in failing to object. "[I]t is not correct to equate counsel's submission to an error with deficient performance. . . . We must view a decision to not object in context and determine whether correcting the error was sufficiently important under the circumstances that failure to do so was objectively unreasonable—i.e., a battle that competent counsel would have fought." *State v. Ray*, 2020 UT 12, ¶ 32, 469 P.3d 871. Because Mother's testimony was not particularly detailed or lengthy, in contrast to the more detailed evidence that would be provided later in Emma's trial testimony and in the video of her CJC interview, we cannot say Counsel's decision to forgo hearsay objections to Mother's testimony at the beginning of the trial was objectively unreasonable. Thus, this assertion of ineffective assistance fails.

B.    Grandmother

¶43 As to the claim regarding Grandmother's testimony, Moore identifies two problematic statements. First, he points to Grandmother's responses to questions regarding whether the girls and their biological parents had ever lived with Moore: "I don't know if they lived with him but I know that they took over his apartment. . . . That's per my [son]." Second, Moore points to Grandmother's statement about the timing of the family moving into Moore's apartment. When asked if she knew whether Moore was living in the apartment the family moved into, she responded, "No. Only that my son said [Moore]—it was [Moore's] apartment and . . . he was moving and [Biological Father and

Biological Mother] moved in." Moore argues that it was unreasonable for Counsel to fail to object to these two hearsay statements because a "key question" of the case was "whether [Moore] had the opportunity to commit the alleged offenses" and "the inadmissible hearsay supported that [Moore] did have the opportunity."

¶44　But we do not see that these statements made the jury more likely to conclude that Moore had the opportunity to abuse the children. First, these statements do not suggest that the children moved into Moore's apartment while he was still there; Counsel verified during cross-examination that Grandmother had been told "that [Moore] was moving out and [Biological Father and Biological Mother] were moving in," thus suggesting that these two moves happened at the same time. Second, whether Moore had the opportunity to commit the alleged offenses did not turn on whether he had ever actually lived with Emma and Ivy. Biological Mother testified that Biological Father and Moore were "like brothers" and that when the children were living in the Orem house, Moore would "be at the home every day" and would "stay there" despite having a place of his own. She also testified that Biological Father would take the children to Moore's place "[m]aybe every other day." Thus, Moore had ample opportunity to abuse the children when they were living at the Orem house—an opportunity consistent with at least some of the abuse timelines asserted by Emma and Ivy. Accordingly, Counsel's decision not to raise objections to Grandmother's statements was reasonable.

### III. The CJC Assessment Forms

¶45　Moore argues that Counsel rendered ineffective assistance by failing to object to the jury taking the CJC assessment forms into the deliberation room. Moore points to rule 17 of the Utah Rules of Criminal Procedure, which provides, "Upon retiring for deliberation, the jury may take with them the instructions of the

court and all exhibits which have been received as evidence, except exhibits that should not, in the opinion of the court, be in the possession of the jury, such as exhibits of unusual size, weapons or contraband." Utah R. Crim. P. 17(k). And he primarily bases his argument on the "testimonial" character of the assessment forms, citing to prior case law specifying that "exhibits which are testimonial in nature" are among those that "should not be given to the jury during its deliberations," *State v. Eyre*, 2019 UT App 162, ¶ 30, 452 P.3d 1197 (quoting *State v. Cruz*, 2016 UT App 234, ¶ 35, 387 P.3d 618), *rev'd on other grounds*, 2021 UT 45, 500 P.3d 776; *see also State v. Carter*, 888 P.2d 629, 643 (Utah 1995), *superseded by rule as recognized in Wyatt v. State*, 2021 UT 32, 493 P.3d 621. This argument is unavailing.

¶46    The very authority to which Moore cites regarding the jury's access to testimonial evidence itself recognizes that "Utah law has only extended this principle to recorded or transcribed testimony that substitutes a witness's live testimony." *Eyre*, 2019 UT App 162, ¶ 31. And our supreme court has recognized that while "[t]he negative implication" of rule 17 is that items *not* received as exhibits—such as "transcripts of deposition testimony and of testimony given under oath at a prior proceeding"— should not go back with the jury, "the language of the rule unambiguously allows testimonial exhibits to go back with the jury to deliberations." *Wyatt*, 2021 UT 32, ¶ 19 & n.17. In sum, "the plain language of rule 17(k) does not allow for any categorical exceptions to exhibits going back with the jury" and "any exception to the rule is left to the sound discretion of the district court." *Id.* ¶ 21.

¶47    Furthermore, this court has recently applied our supreme court's reasoning regarding rule 17 to specifically conclude that it is "well within the trial court's discretion to allow [the report of a sexual assault nurse examiner] to go back with the jury" and that "[a]n objectively reasonable attorney would know that and could therefore reasonably decide not to object." *State v. Flores*, 2024 UT

App 195, ¶ 37. This court rejected the argument that such a report "was effectively a transcript of [the victim's] trial testimony" because it "mimick[ed] [the victim's] testimony at trial." *Id.* ¶ 38 (quotation simplified). The court responded that the expert report "was not a transcript" and that the victim's statement contained therein "was not deposition testimony, testimony given under oath, or a statement made in a prior proceeding, and as such there was no reason for [defense counsel] to object to [that exhibit] accompanying the jury into its deliberations." *Id.* (quotation simplified).

¶48    The same is true here. The CJC assessment forms are not transcripts, nor are the statements therein deposition testimony or other testimony given under oath. And even if the assessment forms are properly characterized as testimonial exhibits, this alone would not have been a reason for Counsel to have objected to them going back with the jury. *See Wyatt*, 2021 UT 32, ¶ 19. Thus, Counsel did not perform deficiently by refraining from objecting on this basis.

¶49    Moore additionally argues that Counsel should have objected to the CJC assessment forms being sent back with the jury because of the "undue emphasis" this gave to the allegations of Emma and Ivy.[6] *See id.* ¶ 24 ("In considering whether to prohibit an exhibit from going back with the jury, a district court

_____

6. Moore initially frames this argument using the "unfair prejudice" language of rule 403 of the Utah Rules of Evidence. *See* Utah R. Evid. 403 (providing for the exclusion of evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice"). However, we question the applicability of this rule regarding the admissibility of evidence to the issue of whether the jury should have access to admissible evidence during deliberations. Because Moore provides no further explanation as to the applicability of rule 403 in the rule 17 context, we decline to engage in that analysis here.

may consider whether the jury's unfettered access to the exhibit would lead to undue emphasis."). But considering that those allegations were repeatedly conveyed at trial—both directly by Emma and Ivy as part of their trial testimony and also through the viewing at trial of videos of their CJC interviews—we are unconvinced that the summary recitation of those allegations in the assessment forms would have resulted in an inappropriate emphasis on those claims such that it was deficient performance for Counsel to have failed to seek an exception under rule 17.

¶50 Moreover, and importantly, there was a legitimate strategic reason for Counsel to not object and, instead, emphasize the admissibility of the CJC assessment forms. *See State v. Bedell*, 2014 UT 1, ¶ 25, 322 P.3d 697 (determining that an "ineffective assistance of counsel claim must fail" where "there was a legitimate strategic decision" for defense counsel's use of evidence). This is because the assessment forms supported the defense's theory of the case—that although there was "no doubt" the girls had been abused, the girls were lying about Moore being the perpetrator. Emma's CJC assessment form contained documentation that Emma suffers hallucinations, has "[b]ehavioral trouble due to stealing and lying," and loses friends "because she is manipulative and steals"—each of which Counsel highlighted for the jury in his opening statement, his cross-examination of Nurse, and his closing argument. And the contrast between the two assessment forms showed a much more lengthy and detailed set of allegations by Emma and a much more limited and vague set of allegations by Ivy, which could have supported the defense's theory that Ivy had no "actual memory" of the abuse and was relying on what she had been told by Emma.

¶51 Moore argues that Emma's CJC assessment form was particularly problematic because it documented "severe behavioral issues not mentioned at trial" and that the jury's "unfettered access" to these additional details "opened the possibility" of the jury "erroneously attributing these behaviors to

the alleged abuse." But even if the jury attributed these behaviors to abuse and, as a result, was more convinced that Emma *had* been abused, there is no reason to believe that this information would have made the jury more likely to believe that Moore was the perpetrator. Thus, in such a scenario, Counsel could reasonably believe that the jury's exposure to these details (and increased belief that abuse occurred) would not harm Moore's case.

¶52    Finally, Moore points to Emma's assertion relayed in her CJC assessment form that sometimes the children would be left in Moore's care for a week at a time and that "[s]ometimes he kept [them] from school," and he argues that these "new allegations" were "particularly troubling because Emma was not subject to cross-examination on these statements." But Moore offers no explanation as to why Counsel would have been unable to ask about either of these allegations when cross-examining Emma. And, indeed, Counsel *did* question Emma about her assertion that the children were left in Moore's care for a week at a time. Thus, this particular concern regarding an opportunity for cross-examination is unfounded.

¶53    In sum, where rule 17 does not generally preclude testimonial evidence from being sent back with the jury and where Counsel could have made the reasonable strategic decision to allow the CJC assessment forms to go back with the jury because he clearly considered many details therein as supportive of the defense's theory of the case, Counsel did not perform deficiently by failing to raise an objection under rule 17. Thus, this claim of ineffective assistance of counsel fails.

## IV. Cumulative Error

¶54    Moore asks this court to consider the combined prejudicial effect of the various asserted errors and to reverse his convictions under the cumulative error doctrine. Under this doctrine, "we will reverse a jury verdict or sentence only if the cumulative effect of the several errors undermines our confidence that a fair trial was

had." *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 39, 428 P.3d 1038 (quotation simplified). But we have identified no deficient performance on the part of Counsel, and therefore this doctrine is inapplicable in this case.

CONCLUSION

¶55    Counsel did not perform deficiently when he chose to not object to the testimony regarding an alleged rape of Biological Mother, when he failed to object to certain statements in Mother's and Grandmother's testimony, or when he chose to allow the CJC assessment forms to go back with the jury. Thus, each of Moore's claims of ineffective assistance fail, and we affirm his convictions.

————————