**2025 UT App 140**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
LUIS IGNACIO MENDOZA,
Appellant.

Opinion
No. 20210856-CA
Filed September 25, 2025

Third District Court, Salt Lake Department
The Honorable Heather Brereton
The Honorable Paul B. Parker
No. 191901143

S. Spencer Brown, Scarlet R. Smith,
Jordan T. Greenburg, and Davis P. Pope,
Attorneys for Appellant

Derek E. Brown and Daniel L. Day,
Attorneys for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN D. TENNEY concurred.

OLIVER, Judge:

¶1     Luis Ignacio Mendoza was convicted by a jury on four counts of rape, one count of aggravated sexual abuse of a child, one count of object rape, and one count of forcible sodomy for the abuse of his then-stepdaughter, Gabriela.[1] Mendoza appeals his conviction, arguing that his counsel provided ineffective assistance. Mendoza also filed a motion to remand pursuant to rule 23B of the Utah Rules of Appellate Procedure for further factual findings related to his testicular hernia, which he testified

---

1. A pseudonym.

at trial prevented him from abusing Gabriela. We affirm his convictions and deny his rule 23B motion.

BACKGROUND[2]

*Abuse at the Murray Apartment*

¶2     Gabriela's mother (Mother) began dating Mendoza in 2003, around the time Gabriela was two years old, and Mother and Mendoza later got married. Gabriela, her brother (Brother), Mother, and Mendoza moved into an apartment in Murray (the Murray Apartment) when Gabriela was in elementary school. There, Gabriela shared a bedroom and bed with Mother and Mendoza and slept in between them each night.

¶3     While Gabriela and her family lived at the Murray Apartment, Mendoza sexually abused Gabriela repeatedly when the two were home alone, following a similar pattern each time. First, he would kiss her on the face or lips before touching her hair and getting closer to her. Then, he would touch her breasts with his hands over her clothes. Sometimes he would then touch her legs; other times, he would go under her clothes and touch her breasts before moving to her legs. When he touched her legs, he would rub them and get closer to her vagina. He would then start rubbing her vagina outside of her clothes. If someone came into the apartment, he would stop. Otherwise, he would go under her clothes to rub her vagina with his fingers and put his fingers inside her vagina, moving them up and down. When he was finished, he would tell Gabriela "to [not] tell anybody" and to "keep it a secret."

_____

2. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Huey*, 2022 UT App 94, n.2, 516 P.3d 345 (cleaned up).

¶4    Mendoza sexually abused Gabriela in the living room, dining room, and bedroom of the Murray Apartment. When the abuse happened in the bedroom, Mother would sometimes be present, so Mendoza's behavior was slightly different. Mendoza would touch Gabriela while she was lying on the bed, under a blanket. He would reach under the blanket and touch her leg, getting closer to her vagina before beginning to rub her vagina under her clothes.

*Abuse at the Van Buren House*

¶5    Gabriela, Brother, Mother, and Mendoza later moved to Salt Lake City and lived in two different houses, one on Navajo Street (the Navajo House) and one on Van Buren Street (the Van Buren House). Gabriela did not recall Mendoza abusing her while they lived at the Navajo House. However, things changed when the family moved to the Van Buren House.

¶6    When the family first moved to the Van Buren House, they occupied two bedrooms in the basement of the home, which they shared with extended family members. Mother, Gabriela, and Mendoza were in one bedroom, and Brother was in another. Mendoza sexually abused Gabriela in both bedrooms, depending on where they were sleeping at the time. He would touch her legs with his hands before rubbing her vagina with his hand under her clothes. If someone came into the bedroom, he would stop. However, if he was not interrupted, he would "stick his finger up [her] vagina." In one of the bedrooms, Mendoza went "further and [stuck] his penis up [her] vagina" (the First Bedroom Incident). At one point, he also "kiss[ed]" her vagina with his lips (the Kissing Incident).

¶7    Eventually, Gabriela got her own bedroom upstairs. Mendoza sexually abused her there one time as well (the Second Bedroom Incident). Mendoza knocked on Gabriela's door and asked if he could come in; she let him in, and he went to her bed. He touched her hair and face and kissed her cheeks, lips, and

neck. He then touched her vagina under her clothes before taking off her pants and underwear and rubbing her vagina. He took off his own shirt and pants, put his penis into her vagina, and started "moving up and down." After he was done, Mendoza told Gabriela to be "quiet and not tell anybody" and "to keep it a secret."

¶8      Yet another instance of abuse occurred when Gabriela and Mendoza were in the garage together (the Garage Incident). Mendoza closed the garage door while Gabriela looked for what she needed with a flashlight (there was no light in the garage). Mendoza stepped behind Gabriela and started touching her and "reaching for . . . [her] vagina" over her clothes. Then, he removed both of their pants and "put his penis into [her] vagina." He moved "[u]p and down" with his penis inside her. When he was done, he opened the garage door and went back inside.

*Gabriela Discloses the Abuse to Mother*

¶9      At some point around 2015, while living at the Van Buren House, Gabriela gave Mother a note (the Note) that said, "[Mendoza] is having sex with me." Mother told Gabriela to keep what was happening a secret and that she would talk to Mendoza when he got home from work. Gabriela did not observe a conversation between Mother and Mendoza, but after she disclosed the abuse to Mother, Mendoza stopped abusing her at the Van Buren House.

¶10      Mother ultimately spoke with Mendoza, and he told her that he could not have erections because he had a testicular hernia from a prior work accident. However, Mother knew he could get an erection because she was having "sexual relations" with him up to this point. Mother did not report the abuse to the police.

*Abuse at the West Valley City House*

¶11    When Gabriela was in high school, the family moved to a house in West Valley City, where he again sexually abused her (the West Valley Incident). At this point, Mother and Mendoza were separated but were still living together. Mendoza slept in the basement of the house, and Gabriela slept in a bedroom upstairs. One day, Mendoza came into Gabriela's bedroom saying he wanted to talk to her. Mendoza then "grabbed [Gabriela] and . . . put [her] on the bed" and took off her pants. He put his penis in her vagina and "started moving." When he was finished, Mendoza again told Gabriela not to tell anyone.

*Birthday Party and Subsequent Investigation*

¶12    In March 2018, when Gabriela was sixteen, she was at a birthday party for one of her aunts. Mother and several other aunts, including Gabriela's aunt Carmen,[3] were in attendance. Carmen later drove Gabriela home. Gabriela was anxious during the drive. When they parked in the driveway of the house, Carmen asked Gabriela what was wrong. Gabriela started crying and told Carmen she wanted to see a psychologist because if she did not, she feared she would commit suicide. Carmen asked Gabriela why, and Gabriela would not tell her initially; she just continued to cry. Eventually, while crying and "shaking," Gabriela told Carmen that Mendoza "sexually abused [her]." Carmen told Gabriela she was going to talk to Mother. The next day, Carmen talked to Mother.

¶13    At some point after the birthday party, Mother disclosed the abuse to another of Gabriela's aunts. This aunt told another aunt about what happened, and these two aunts later reported it to police. Gabriela was interviewed at the Children's Justice Center (CJC) in April 2018 (the CJC Interview). Mendoza was later arrested and charged with four counts of rape of a child, two

---

3. A pseudonym.

counts of aggravated sexual abuse of a child, and three counts of sodomy upon a child.

*Trial*

¶14 The State called seven witnesses who collectively testified to the above facts, including Gabriela, Mother, Carmen, several other aunts, and the detective (Detective) who investigated Gabriela's case.

¶15 Detective testified Mother had told her she believed Mendoza when he said he could not get an erection because they were not having sexual intercourse. Detective confirmed Gabriela did not mention the Kissing Incident during the CJC Interview.

¶16 Mother testified that while living in the Van Buren House, she noticed Gabriela was depressed. Gabriela's grades "weren't like they used to be," and though she was going to school, "she was not paying attention and she wasn't doing the homework." Regarding the Note, Mother testified she had kept the Note but it was lost when she moved. On cross-examination, Mother admitted she originally told police Mendoza was unable to get an erection and she knew this because they were not having sexual intercourse at the time. She testified she initially made that statement to police because Mendoza was "psychologically manipulating" her. She stated she did not explain herself well and had been trying to express that she knew he was "capable of having an erection."

¶17 The State then called an expert (Expert) to testify as a blind witness.[4] Expert has a degree in social work and, at the time of trial, was the forensic services manager at the CJC, where he conducted forensic interviews, supervised forensic interviewers,

---

4. A blind witness is one who is "unaware of the facts and allegations" in a particular case. *State v. Garcia*, 2025 UT App 119, ¶ 36, *petition for cert. filed*, Sept. 3, 2025 (No. 20251052).

and trained detectives and caseworkers on forensic interviewing. He testified about the level of detail children speak in when disclosing abuse and the demeanor of children when talking about abuse. While testifying about children's demeanors, the State asked Expert whether "the way a child will present themselves while talking about child abuse" varies, to which Expert answered in the affirmative. The State then asked Expert, "[W]hat kind of range have you seen?" Expert replied, "[I]t really depends on the child. Everyone responds to things differently. Everyone responds to, you know, providing a disclosure in the interview differently." At this point, the court called a bench conference and expressed concern that while there was no objection by Mendoza's counsel (Counsel), the State was "getting awful close to some kind of a discussion about . . . truthful or untruthful . . . acts." Counsel agreed but then stated, "I can tell you the lawyers in my office have challenged, I believe, [Expert] unsuccessfully and there is bad appellate law on this issue. But I agree with you." Ultimately, the court and Counsel agreed that Expert's testimony should be cabined to discuss only that "different victims [act in] different ways" and assumptions should not be made "based on the demeanor of a victim."

¶18 The State then moved the discussion to late disclosure of abuse and explained it wanted to introduce testimony from Expert that "long delays are not uncommon and . . . should not necessarily be held against the victim." The court permitted the State to elicit testimony from Expert about children in general and the commonness of late disclosures. But it did not permit the State to present testimony related to Gabriela specifically, stating, "I don't think we go past that as far as talking about whether or not it's common, whether or not this child delayed, anything like that." Expert then testified about factors that "affect when a child discloses abuse."

¶19 After the State rested, Mendoza testified on his own behalf. He explained that prior to moving to the Murray Apartment, he

got injured at work while carrying something very heavy on his own. He said the injury felt like "something [was] stretching or . . . breaking inside one of [his] testicle[s]." When the injury occurred, Mendoza struggled to walk and one of his testicles looked like "a big red . . . tomato." He described the injury as "really painful." Mother took him to a doctor, who diagnosed the injury as a testicular hernia. Mendoza was told he needed surgery, but he could not afford it and was put on a waitlist to receive free surgery. Mendoza testified that as of the time of trial, he still had not received the surgery and the injury had not healed on its own.

¶20    Mendoza explained that the injury had impacted his sexual activity and desire because erections were painful. He testified the last time he had sex was with Mother around a week before the injury, he had not had sex since, and he had not been able to masturbate. He also said he felt no sexual desire or attraction because of the injury.

¶21    At closing, the State referred to Expert's testimony, stating, "[Expert] talked about . . . things that he's seen . . . in the interviews that he's done with children. Children react in different ways to abuse . . . . [C]hildren talk differently. It's kind of all [over] the map the way children talk about abuse."

¶22    The jury found Mendoza guilty on four counts of rape for the First Bedroom Incident, the Second Bedroom Incident, the Garage Incident, and the West Valley Incident; one count of aggravated sexual abuse of a child for touching Gabriela's breasts and vagina at the Murray Apartment; one count of object rape for touching her vagina at the Van Buren House; and one count of forcible sodomy for the Kissing Incident.[5] He was sentenced to prison for each conviction.

---

5. The State had amended the charges before trial, and voluntarily dismissed two charges at the conclusion of the evidence.

ISSUES AND STANDARDS OF REVIEW

¶23 Mendoza asserts multiple instances of ineffective assistance of counsel, which he argues warrant reversal.[6] "In determining a claim of ineffective assistance of counsel raised for the first time on appeal, we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Moore*, 2025 UT App 26, ¶ 27, 566 P.3d 69 (cleaned up), *cert. denied*, 570 P.3d 658 (Utah 2025).

¶24 Mendoza also filed a motion to remand under rule 23B of the Utah Rules of Appellate Procedure. Remand "will be available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." Utah R. App. P. 23B(a).

ANALYSIS

I. Expert's Testimony

¶25 Mendoza argues that Counsel provided ineffective assistance because he failed to object both to Expert's testimony regarding how children react to sexual abuse and to the State referencing Expert's testimony in closing.[7] Specifically, Mendoza contends that Expert's "testimony bolstered [Gabriela's] position by getting the jury to speculate [she] acted just like other

---

6. Mendoza also argues that, when viewed together, the cumulative harm of Counsel's deficiencies "resulted in a prejudicial effect." Because we ultimately conclude Counsel did not perform deficiently, we need not address this issue.

7. Mendoza clarified at oral argument that he was not challenging Expert's qualifications pursuant to rule 702 of the Utah Rules of Evidence.

children," in violation of rule 403 of the Utah Rules of Evidence. We disagree.

¶26   To succeed on a claim of ineffective assistance of counsel, a defendant must show that "counsel's performance was deficient" and the "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A defendant must make both showings to demonstrate the conviction "resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* Because both deficient performance and prejudice are required under the test, it likewise follows that "a defendant's failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim." *State v. Moore*, 2025 UT App 26, ¶ 31, 566 P.3d 69 (cleaned up), *cert. denied*, 570 P.3d 658 (Utah 2025). Here, Mendoza fails to demonstrate that Counsel performed deficiently.

¶27   "An attorney's performance is constitutionally deficient if counsel's act or omission caused . . . representation to fall below an objective standard of reasonableness." *State v. Hunter*, 2021 UT 44, ¶ 68, 496 P.3d 119 (cleaned up). "If an attorney's decisions can be explained by a reasonable trial strategy, the defendant has necessarily failed to show deficient performance." *Id.* (cleaned up); *see also State v. Griffin*, 2015 UT 18, ¶ 21, 441 P.3d 1166 ("We indulge in the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (cleaned up)). The ultimate question "is not whether some strategy other than the one that counsel employed looks superior given the actual results of trial" but, rather, "whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial." *Hunter*, 2021 UT 44, ¶ 68 (cleaned up).

¶28   Rule 403 permits the district court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Utah R. Evid. 403. Expert

witnesses are permitted to "testify about common symptoms or behaviors of sexual abuse victims" without violating rule 403 so long as the experts do not speak to the truthfulness of a particular witness or victim. *State v. Francis*, 2025 UT App 104, ¶¶ 71, 73 (cleaned up). As recognized in *Francis*, appellate courts have repeatedly affirmed the admissibility of such expert testimony. *See id.* ¶ 73 (citing a line of cases affirming admission of expert testimony discussing "common behaviors of children who have been abused," "symptoms [which] are more commonly associated with sexual abuse victims than with the population at large," and how "victims often delay reporting" (cleaned up)); *see also id.* ("Utah courts have recognized that delayed discovery and reporting are common in child sexual abuse cases." (cleaned up)).

¶29    Here, Mendoza relies heavily on *State v. Burnett*, 2018 UT App 80, 427 P.3d 288. In *Burnett*, the State called a blind expert witness who testified that it was "most common for abuse victims to delay disclosure of the abuse." *Id.* ¶¶ 8–9. The expert then testified that divorce can impact disclosure and "acknowledged that there exists a small percentage of cases in which children from divorced families fabricate abuse allegations" and that part of his professional duties included trying "to figure out which instances are the ones that involve fabricated allegations." *Id.* ¶ 9 (cleaned up). The expert concluded his testimony by stating that, in his experience, false allegations of child sexual abuse initiated by children "are less common than actual allegations, but they do occur." *Id.* ¶ 10 (cleaned up). In closing, the State highlighted the expert's testimony, reiterating the expert's statement that "specific and unusual disclosures were more reliable" and "in the rare cases when there are false allegations," the victim usually alleges that the abuser touched his or her "private part." *Id.* ¶ 17.

¶30    The *Burnett* court held that "the clear import" of the expert's testimony was "that only in a small percentage of sexual abuse cases" are there false allegations. *Id.* ¶ 36 (cleaned up). Even though the expert "stopped short of offering an opinion that [the

victim] herself was telling the truth," the court concluded that "by presenting (and later, in closing argument, emphasizing) this testimony, the prosecution was clearly inviting the jury to draw inferences about [the victim's] credibility based upon [the expert's] past experience with other cases." *Id.* (cleaned up). Accordingly, the court determined that trial counsel was ineffective for failing to object to the improper testimony. *Id.* ¶¶ 36, 41.

¶31  Mendoza suggests Expert's testimony is similar to that in *Burnett* because it "invited the jury to speculate that [Gabriela] acted like other children act in disclosing sexual abuse." But this case is not like *Burnett*. In *Burnett*, this court stated, "We simply cannot imagine any convincing tactical reason for counsel to have consciously decided not to raise" an objection to the expert's "testimony regarding credibility." *Id.* ¶ 37. Here, we know why Counsel did not raise an objection to Expert's testimony because Counsel stated the reason on the record: "I can tell you the lawyers in my office have challenged, I believe, [Expert] unsuccessfully and there is bad appellate law on this issue."[8] Counsel's statement indicates he believed making such an objection would be futile. And attorneys are not required to make futile objections to ward off ineffective assistance claims on appeal. *See State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 ("Failure to raise futile objections does not constitute ineffective assistance of counsel."). Here, such an objection would likely have been futile.

¶32  Expert testified about children in general and the commonality of late disclosures, along with factors that "affect when a child discloses abuse." At no point did Expert present testimony that would relate to Gabriela specifically. Nor did the

---

8. By "bad appellate law," we understand Counsel to be referring to case law from our court and our supreme court that does not support such a challenge to Expert's testimony. *See, e.g., State v. Francis*, 2025 UT App 104, ¶¶ 70–75 (discussing such cases).

State insinuate as much during closing. Instead, the State only reminded the jury what it heard by explaining, "[Expert] talked about . . . things that he's seen . . . in the interviews that he's done with children. Children react in different ways to abuse . . . . [C]hildren talk differently. It's kind of all [over] the map the way children talk about abuse." And such general opinions from a blind expert witness about commonalities in disclosure of abuse are admissible. *See Francis*, 2025 UT App 104, ¶¶ 72–73. Thus, any such objection would likely have been futile, and Counsel's decision not to object on this basis was objectively reasonable. Therefore, Mendoza has not demonstrated that Counsel provided anything less than constitutionally effective assistance.

## II. Counsel's Failure to Investigate

¶33 Mendoza also argues that Counsel was ineffective for failing to "adequately investigate Mendoza's testicular injury." Specifically, he complains that Counsel performed deficiently in not locating Mendoza's medical records prior to trial and in not calling a medical expert witness at trial who could "present evidence of the effects of [his] injury." Mendoza filed contemporaneously with his appellate brief, a motion pursuant to rule 23B of the Utah Rules of Appellate Procedure seeking a remand to develop facts in support of this claim (the 23B Motion).[9]

¶34 Rule 23B "provides a mechanism for criminal defendants to supplement the record with [nonspeculative] facts that are necessary for a finding of ineffective assistance of counsel but which do not appear in the record." *State v. Griffin*, 2015 UT 18, ¶ 17, 441 P.3d 1166; *see also* Utah R. App. P. 23B(a) ("The motion will be available only upon a nonspeculative allegation of facts,

---

9. Mendoza conceded at oral argument that no evidence in the record supports his claim that Counsel failed to investigate his medical records or consider a possible medical expert. We thus consider these arguments only through a rule 23B lens.

not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective."). A rule 23B motion must "be accompanied by affidavits or declarations . . . that show the claimed deficient performance of the attorney." Utah R. App. P. 23B(b). "[I]f the defendant [cannot] meet the test for ineffective assistance of counsel, even if his new factual allegations [are] true, there is no reason to remand the case, and we [will] deny the motion." *Griffin*, 2015 UT 18, ¶ 20.

¶35     Mendoza attached to the 23B Motion an affidavit from a nurse practitioner (Nurse) who specializes in child abuse and neglect. She declared the "medical records received from the Utah Department of Corrections corroborate . . . Mendoza's testimony that he suffered from a testicular hernia," along with a ventral and an inguinal hernia. She stated she would have testified that (1) Mendoza's hernia would have caused him "pain, irritation, and inflammation," which "would likely decrease [his] sex drive consistent with his testimony"; (2) he "would be unlikely to be able to sustain an erection because of the pain caused by the three hernias"; (3) it "is typical for males to endure pain, even at the expense of their sex drive, to avoid a disruption in their day-to-day life"; (4) it is "common for males to endure pain when reparative surgery costs are high"; and (5) men often "avoid seeking treatment until their pain levels reach intolerable levels." But even if we credit all of these statements, the affidavit is deficient because Nurse did not state she would have been available to testify at trial.[10] *See State v. Gonzales-Bejarano*, 2018 UT App 60, ¶ 28, 427 P.3d 251 (denying a defendant's rule 23B motion

---

10. The State asserts that "[r]easonable counsel could . . . question whether . . . a board-certified nurse practitioner who specializes in assessing children and adolescents for sexual abuse, physical abuse, and child endangerment" would be "qualified to testify about the adult abuser's ability to sexually abuse" Gabriela. But because we find Nurse's affidavit deficient on other grounds, we need not address this argument, meritorious though it may be.

where the affidavit "did not directly discuss whether" the purported witnesses "would have been *available* to testify at trial").

¶36 Even more importantly, Mendoza did not attach an affidavit to the 23B Motion from Counsel or from anyone who could speak to what Counsel did or did not do to investigate Mendoza's testicular hernia. As Counsel's "claimed deficient performance" centers on his actions (or lack thereof), the essential question here is whether Counsel attempted to locate the medical records or find an expert to testify to Mendoza's medical condition. *See* Utah R. App. P. 23B(b). Nurse's affidavit does nothing to answer that question. If we were to remand the case to the district court for additional findings, the only information added to the record would be about Mendoza's medical condition, which the State never disputed he had. The remand would not address the issue of whether Counsel attempted to find Mendoza's medical records or obtain an expert witness to testify at trial. Without this information, Mendoza's argument "is speculative and not sufficient to show a reasonable likelihood of a more favorable outcome." *State v. Suhail*, 2023 UT App 15, ¶ 124, 525 P.3d 550 (concluding that the defendant's rule 23B proffer was insufficient for failing to provide "any support for his claim" that counsel did not investigate an expert witness); *see also State v. De la Cruz-Diaz*, 2012 UT App 179, ¶ 6, 282 P.3d 1041 (denying a defendant's rule 23B motion where he failed "to provide support in the record for his claim that counsel did not consult with an expert").

¶37 "[W]e presume that counsel performed effectively where the record does not demonstrate otherwise." *De la Cruz-Diaz*, 2012 UT App 179, ¶ 6. Without a sufficient, nonspeculative proffer of evidence concerning Counsel's actions, we must presume Counsel provided effective assistance. We therefore deny the 23B Motion.

CONCLUSION

¶38     Counsel was not ineffective for failing to object to Expert's testimony or to the State's reference to Expert's testimony in closing. And because the 23B Motion does not provide any information as to whether Counsel attempted to locate Mendoza's medical records or consult with an expert witness to testify at trial, we cannot say that Counsel was ineffective on these fronts either. Accordingly, we affirm Mendoza's convictions and deny the 23B Motion.

———————