**2025 UT App 63**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CARL DAVID JOHNSON,
Appellant.

Opinion
No. 20200937-CA
Filed May 1, 2025

Third District Court, West Jordan Department
The Honorable Katie Bernards-Goodman
No. 171402188

Emily Adams, Freyja Johnson, Cherise Bacalski, and
Brittany A. Urness, Attorneys for Appellant

Derek E. Brown and Karen A. Klucznik,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES DAVID N. MORTENSEN and RYAN D. TENNEY
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 After fatally shooting his neighbor, Carl David Johnson was charged with murder. At trial, Johnson argued he had acted in self-defense, and he was ultimately acquitted of murder but convicted of manslaughter. Johnson now claims his trial counsel (Counsel) was ineffective for failing to ensure the jury was adequately instructed on the law of self-defense, including both perfect and imperfect self-defense. Because Johnson has not demonstrated that he was prejudiced by Counsel's alleged errors, we reject his claim and affirm his conviction.

BACKGROUND[1]

¶2      Johnson and Tom lived in the same apartment building. The building had an outdoor patio where tenants were allowed to drink and smoke. The patio was located under a staircase. The staircase was metal and had two flights of stairs with a landing in between.

¶3      Late one summer morning, Tom and another neighbor (Neighbor) decided to sit on the patio and drink beer. Around 1:00 p.m., Johnson returned home from drinking and playing golf and decided to join Tom and Neighbor for "a few more" beers. Johnson approached the two men and offered to buy Tom's favorite beer, Pabst Blue Ribbon, even though he personally disliked that brand of beer. Upon his return from walking to the nearby convenience store to purchase the beer, Johnson sat on the patio with Tom and Neighbor for "[a]t least two hours" while the three talked and drank.

¶4      After the men had consumed "almost [the] whole 18 pack" of beer, Tom started talking like a "tough guy." Following some arguing back and forth between Tom and Johnson, things devolved, and both men stood up to fight. As the two wrestled around, Tom knocked Johnson to the ground, and he landed with his head against the steps. According to Johnson, Tom then proceeded to choke him for approximately two minutes. Johnson later claimed that he "couldn't breathe" and thought he "was going to die." Neighbor remained sitting on the patio for the duration of the fight; although he saw Tom take Johnson to the ground, he did not report seeing Tom choke Johnson.

---

1. "On appeal from a jury verdict, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, presenting conflicting evidence only as necessary to understand issues raised on appeal." *State v. Dever*, 2022 UT App 35, n.2, 508 P.3d 158 (quotation simplified).

¶5     While Tom was choking Johnson, a roll of quarters fell out of Johnson's pocket. Upon noticing the roll, Tom "let [Johnson] go." Tom then picked up the roll and returned to sit with Neighbor. Johnson got up from the ground, grabbed the open case of Pabst Blue Ribbon, and retreated upstairs to his apartment.

¶6     Johnson remained upstairs for several minutes. While he was upstairs in his apartment, he placed the case of Pabst Blue Ribbon inside the front doorway and retrieved his gun. From inside the doorway at the top of the stairs, Johnson overheard Tom—who was still sitting on the patio with Neighbor—calling him vulgar names, so he decided to go downstairs. As Johnson walked down the stairs, Tom stood up from his chair underneath the stairs and started walking alongside the stairs toward the front of them. When Neighbor saw Tom stand up, he figured the fighting was not over and assumed that Tom would "probably" grab Johnson and "take him down again."

¶7     Tom never made it to the front of the stairs. When Johnson was about halfway down the last flight of stairs, he saw Tom "coming towards the bottom of the stairs." Johnson was "afraid," so he pulled out his gun and shot Tom. The bullet entered Tom's back and traveled at a downward angle. It severed Tom's spinal cord, which immediately paralyzed him from the waist down and caused his legs to collapse. Tom fell straight forward and landed on the ground; he was positioned on his stomach, parallel with the side of the stairs, with the upper part of his body nearly even with the bottom step.

¶8     After firing the gun, Johnson continued down the stairs. Although Tom was partially paralyzed and bleeding internally, the gunshot was not "instantaneously fatal," and he still had the use of his arms. Johnson reported that Tom was "talking shit" and "kept crawling" toward him, which prompted Johnson to kick Tom multiple times in the face and head while calling him names.

¶9 Prior to the gun going off, another tenant (Tenant) in the building heard "a lot of drunken" yelling coming from the patio. Tenant was about to go downstairs and ask everyone to be quiet when he heard what he thought "might be a gunshot." Tenant went outside to the top of the metal stairs, where he looked down and observed Tom lying face down on the ground moaning. Tenant saw Johnson standing over Tom, and watched as Johnson proceeded to kick Tom repeatedly in the head. Tenant noticed that the back of Johnson's head was "bloody," and something also appeared to be wrong with Johnson's arm. While Johnson continued to kick Tom—who was at that point unconscious and not moving or talking—Johnson told Tenant that Tom had "tried to kill [him]." Tenant instructed Johnson to stop kicking Tom and to put down the gun. Once Johnson complied, Tenant called the police.

¶10 At approximately 4:30 p.m., an officer (Officer)—who had been only a thirty second drive away—arrived on scene. As Officer was driving by the alleyway next to the apartment building where the patio was located, he spotted Johnson waving him down. After Officer exited his vehicle, Johnson immediately told Officer his version of events: "[Tom] strangled me out. Told me he was going to kill me. I went and got my gun, came back down and [shot him]. . . . If I didn't get my gun, I would have died." Johnson pointed to his gun on the ground and repeated that he shot Tom because Tom "was going to kill [him]."

¶11 Officer searched Johnson for additional weapons. As he was doing so, Johnson continued to talk about Tom and the events of the day, repeating statements along the lines of what he had just told Officer. In addition, Johnson mentioned that the shooting took place because "20 minutes ago" Tom had "almost strangle[d] [him] out," and he opined that Tom was not the "victim" but was instead a "bully." Johnson claimed Tom had been bullying people in the apartment complex for "four years" and that he had been "threatening to kill [Johnson] for three years." Ultimately, Officer

did not find any weapons on Johnson during the search, but he did discover a fanny pack around Johnson's waist that contained a can of mace and a body alarm.[2]

¶12 Thereafter, Johnson was transported to the police station. The officer transporting Johnson observed that Johnson had a wound on the back of his head. Once at the station, a paramedic (Paramedic) was called in to assess the injury. Paramedic determined the "small" one-inch laceration on Johnson's head was "superficial" and did not need sutures. As Paramedic was cleaning the wound and applying bandages, he asked Johnson how the injury occurred. Johnson responded, "He did it taking me down by the stairs. . . . I guess he hit my head on something. . . . I think I hit the bar on the stairs or something." Unsolicited, Johnson told Paramedic multiple times that he shot Tom in self-defense after Tom "wrestled [him] down" and "strangled" him so that he "couldn't breathe." Notwithstanding these claims, Johnson did not complain to Paramedic about any other ailments, nor did Paramedic notice any signs that Johnson had been choked (e.g., "marks" around his neck or "hoarseness" of his voice).

¶13 Once Paramedic left, Johnson was alone in the interrogation room for nearly two hours. During this time, he talked out loud to himself, repeatedly saying that he had shot Tom in self-defense because Tom was going to kill him.

¶14 Johnson was eventually interrogated by a detective (Detective). Johnson told Detective that Tom was "the bully of the neighborhood" and had "threatened everybody's life," including Johnson's. Johnson said that because of this, he was "scare[d]" of Tom and he carried a roll of quarters, a body alarm, and a can of mace to protect himself. In addition, Johnson explained that he

---

2. A body alarm is a device that makes a loud "whistling noise" when activated by the wearer. The alarm is designed to help deter an attack or bring attention to the wearer.

used various items, including bars, to reinforce his apartment door to prevent Tom from kicking it in. Despite these alleged threats, when asked by Detective, Johnson admitted that "the first time [Tom] ever actually physically touched [him] was" earlier that day.

¶15  During the remainder of the interrogation, Johnson recounted a version of events that was largely consistent with that recounted above. However, Johnson claimed for the first time that he did not retrieve his gun after returning to his apartment following the initial fight with Tom. Instead, he claimed that he put his gun in his pocket after he went to the convenience store to purchase the beer, but before he joined Tom and Neighbor on the patio.

¶16  Near the end of Johnson's interrogation, a sergeant took photos of Johnson's injuries. In addition to the laceration on Johnson's head, the photos showed a cut on his face, redness on his neck, and a scratch near his elbow. Later, a technician drew Johnson's blood, which was negative for drugs but measured a blood alcohol content of .06. Officers were also sent to search and photograph Johnson's apartment. The officers found an open case of Pabst Blue Ribbon sitting inside the front door. They also found a clear plastic trash bag that contained multiple empty Budweiser cans and one empty Pabst can, sitting in the same general area as the Pabst box. Lastly, the officers noted bars that were consistent with the ones Johnson had described as using to fortify his apartment door.

¶17  Tom died in the hospital. A medical examiner (Examiner) performed an autopsy of Tom's body. Examiner determined that the cause of death was a "gunshot wound to the back." He stated that the "overall pathway" of the bullet was from Tom's "back to his front, from his left to his right, and also a little bit downward." Examiner confirmed that while the bullet would have instantly paralyzed Tom from the waist down, making it impossible for

him to stand, he would "still be able to try and potentially push up" with his arms. Examiner also identified other injuries on Tom's body—including on his head and several places on the left side of his body—that occurred around the time of his death and could have been the result of either an "inflicted injury" (e.g., a kick or a punch) or Tom's fall after he was shot. Lastly, Examiner discovered that Tom's blood alcohol content was .16 and there was a small amount of THC from marijuana use in his system.

¶18    Johnson was charged with murder and felony discharge of a weapon, but the second charge was dismissed at trial. The jury trial lasted for four days and involved several witnesses. The State presented its case primarily through the testimonies of Neighbor, Tenant, Officer, Detective, Paramedic, and Examiner. In addition, the State introduced several items of evidence, including (1) a transcript of Johnson's statements to Officer immediately after the shooting; (2) a transcript of Johnson's interrogation by Detective, which included his statements to Paramedic and his musings to himself while he was alone in the interrogation room; (3) photos of the open case of Pabst Blue Ribbon and the trash bag full of beer cans found inside Johnson's apartment after the shooting; (4) photos of the crime scene and the injuries to Tom's body that may have been inflicted during the fight; and (5) video evidence documenting that it took over one minute to walk from the patio to Johnson's apartment.

¶19    The defense called three witnesses: another resident in Johnson's apartment complex and two of Johnson's co-workers. All three recounted stories illustrating that Tom was a "bully." The first witness attempted to testify about an incident where Tom "had threatened to kill [him]" in the hallway of their apartment building. However, the jury was instructed to disregard those remarks because they were hearsay. The co-workers testified that Johnson was afraid of Tom, often complained about Tom, and had come to work with "scratches" that he claimed were inflicted by Tom.

¶20 Before trial, both sides submitted proposed jury instructions. The district court and the parties discussed the instructions and agreed on a set to be read to the jury.

¶21 The jury was instructed on murder, manslaughter, imperfect self-defense, and perfect self-defense. For the murder charge, the district court instructed the jury that to convict Johnson of murder, it must be convinced beyond a reasonable doubt of the truth of all the elements—including that Johnson "did not act in self-defense or defense of others." It was then instructed that it could find Johnson guilty of manslaughter if it found that he had recklessly caused Tom's death. Later, the jury was instructed that imperfect self-defense was a partial defense to murder that would "reduce the crime of Murder to Manslaughter." Lastly, the jury was instructed that "using force" "likely to cause death or serious bodily injury" is justified "only if the person reasonably believes that force is necessary to prevent death or serious bodily injury to the person or a third person as a result of another person's imminent use of unlawful force, or to prevent the commission of a forcible felony."

¶22 After deliberations, the jury convicted Johnson of manslaughter. Neither party requested a special verdict form, so the jury did not indicate the basis for its verdict. Johnson now appeals.

ISSUE AND STANDARD OF REVIEW

¶23 Johnson argues Counsel rendered ineffective assistance when she failed to ensure the jury was properly instructed on self-defense. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Guerro*, 2021 UT App 136, ¶ 25, 502 P.3d 338 (quotation simplified), *cert. denied*, 525 P.3d 1254 (Utah 2022).

ANALYSIS

¶24    Johnson contends Counsel was ineffective for approving the jury instructions because they did not properly instruct on the law of self-defense. In particular, Johnson complains the instructions pertaining to perfect self-defense were flawed in four respects: (1) they did not adequately instruct on the difference between perfect self-defense and imperfect self-defense, (2) they did not "inform the jury that legal justification is a complete defense requiring acquittal" or that it was the State's burden to disprove the defense, (3) they did not adequately instruct on when the use of deadly force is justified, and (4) the instructions as a whole did "not overcome these flaws." To prevail on this claim, Johnson "must demonstrate that (1) his counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense." *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871 (quotation simplified). "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [Johnson's] claims under [the failure to establish] either prong." *Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182. Here, because Johnson has failed to establish prejudice, we do not reach the issue of whether the instructions were flawed in the ways Johnson contends or whether Counsel performed deficiently in approving them.

¶25    To establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). That is, the defendant's showing must be "sufficient to undermine confidence in the outcome." *Id.* To evaluate prejudice in the context of flawed jury instructions, we "examine whether the jury's verdict would have been different had the potential ambiguity in the jury instructions been removed." *State v. Hutchings*, 2012 UT 50, ¶ 24, 285 P.3d 1183; *see also State v. Ellis*, 2018 UT 2, ¶ 42, 417 P.3d 86

("Prejudice analysis is counterfactual. To decide whether a trial affected by error is reasonably likely to have turned out differently we have to consider a hypothetical—an alternative universe in which the trial went off without the error."). "As we do this, we must keep in mind that jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might, but rather thrash them out during their deliberations, using their commonsense understanding of the instructions in the light of all that has taken place at the trial." *State v. Nelson*, 2015 UT 62, ¶ 42, 355 P.3d 1031 (quotation simplified).

¶26 Here, the jury convicted Johnson of manslaughter. Therefore, to prove prejudice, Johnson must demonstrate there is a reasonable probability that the jury would have acquitted him of manslaughter had the allegedly flawed jury instructions been clarified. Put differently, and in the context of this case, Johnson must show that the jury would have found that he acted in perfect self-defense. *See State v. Cabututan*, 2022 UT App 41, ¶ 14, 508 P.3d 1003 ("Perfect self-defense is a complete defense to any crime that, where applicable, results in acquittal." (quotation simplified)). Based on the evidentiary record before us, we conclude there is no reasonable probability that the jury would have found that Johnson acted in perfect self-defense. This is so because the State presented overwhelming evidence confirming Johnson's guilt and undermining his assertion that he correctly acted in self-defense.

¶27 Under Utah law, the use of deadly force in self-defense is justified "only if the person reasonably believes that force is necessary to prevent death or serious bodily injury to the person or a third person as a result of another person's imminent use of unlawful force, or to prevent the commission of a forcible felony."

Utah Code § 76-2-402(1)(b) (2017).[3] A person acts in perfect self-defense when his belief that deadly force is necessary is "both reasonable and legally justified" under the circumstances. *State v. Silva*, 2019 UT 36, ¶ 29, 456 P.3d 718. "Reasonable in the self-defense context means objectively reasonable." *State v. Wall*, 2020 UT App 168, ¶ 19, 479 P.3d 355 (quotation simplified). Factors that may be considered in determining "imminence or reasonableness" include "the nature of the danger," "the immediacy of the danger," "the probability that the unlawful force would result in death or serious bodily injury," "the other's prior violent acts or violent propensities," and "any patterns of abuse or violence in the parties' relationship." Utah Code § 76-2-402(5).

¶28    The State presented overwhelming evidence that Johnson's fear of imminent deadly force was not reasonable and, thus, that his use of deadly force against Tom was not legally justified. The testimony elicited at trial indicated that the physical altercation on the patio between Tom and Johnson had ended several minutes before Tom was fatally shot. During the interval of time between the two events, Johnson walked away from Tom and retreated up a flight of stairs and into his apartment. Tom did not pursue Johnson, and Johnson returned to the patio of his own volition. And the uncontradicted evidence regarding the physical locations of Johnson and Tom at the time of the shooting belies any notion that Tom posed an imminent threat to Johnson once Johnson returned. Johnson fired the gun from a vantage point *above* Tom and the bullet struck Tom *in his back*. Given that Tom was unarmed and had not even reached the front of the stairs, no

---

3. This statute has since been amended, but we cite the version in effect at the time of the events giving rise to this case. *See State v. Clark*, 2011 UT 23, ¶ 13, 251 P.3d 829 (noting that "we apply the law as it exists at the time of the event regulated by the law in question").

reasonable jury could have found that Tom posed an imminent threat to Johnson at the time he was shot.

¶29　Moreover, Johnson's own statements disproved his claim of perfect self-defense. Although Johnson claimed he shot Tom in self-defense, his rationale for using deadly force was in response to Tom allegedly choking him during their altercation on the patio. But as just noted, because that altercation had come to an end before Johnson left to retrieve his gun, any imminent threat related to that event had passed. In addition, Johnson stated that it was Tom, not him, who stopped the fight, and Johnson acknowledged that Tom did not attempt to stop him when he got up to leave.

¶30　Despite all this, Johnson contends there was "extensive evidence supporting that [his] use of force was both reasonable and legally justified," including Neighbor's testimony about the altercation, Johnson's statement that Tom had choked him during the altercation, and other testimony that Tom was a bully who frequently threatened people. And he asserts that consistent with this evidence, the jury believed he "acted in some form of self-defense because it found him guilty of manslaughter instead of murder." *See State v. Flynn*, 2022 UT App 89, ¶ 15, 515 P.3d 492 ("Imperfect self-defense reduces the murder charge to manslaughter."), *cert. denied*, 525 P.3d 1261 (Utah 2022). This assertion is unavailing for two reasons.

¶31　As an initial matter, Johnson reads too much into the jury's verdict. The jury was properly instructed on murder *and* manslaughter. Because neither party requested a special verdict form, there is no way to know whether the jury found Johnson guilty of manslaughter *or* whether it found Johnson guilty of murder but concluded that he acted in imperfect self-defense, thereby reducing the conviction to manslaughter.

¶32　But even more importantly, the evidence to which Johnson points does not support a conclusion that his use of force was both

reasonable and legally justified. Notably, although Neighbor witnessed the altercation, he did not observe Tom choking Johnson. Therefore, even if Neighbor believed the fight was not over when Johnson returned from his apartment, there is nothing to suggest that this fact alone would support a determination that Tom threatened Johnson with deadly force. To the contrary, Neighbor had just witnessed both men fighting, but Tom ultimately let Johnson go, and Johnson walked away freely. And as just explained, by Johnson's own account, the threat of deadly force that he points to as justification for the shooting occurred in a previous interaction that had already concluded. Thus, any imminent threat no longer existed. Lastly, testimony that Tom had a history of verbally threatening—but not physically harming—people does not lend itself to a determination that Johnson's use of deadly force was reasonable.

¶33   In sum, Johnson's claim fails for lack of prejudice. Because the State presented overwhelming evidence that Johnson was not legally justified in his use of deadly force, "we do not believe that there is a reasonable probability of a different outcome had the jury instructions been rephrased or clarified." *Nelson*, 2015 UT 62, ¶ 50 (quotation simplified).

CONCLUSION

¶34   Because there was overwhelming evidence that Johnson's use of deadly force was not legally justified, there is no reasonable likelihood that the jury would have found he acted in perfect self-defense and acquitted him of manslaughter. Accordingly, Johnson cannot show prejudice, and his claim for ineffective assistance of counsel fails. Affirmed.

———————