2026 UT App 73

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
LEVON GARO MEGUERDITCHIAN,
Appellant.

Opinion
No. 20240108-CA
Filed May 7, 2026

Third District Court, Salt Lake Department
The Honorable Elizabeth A. Hruby-Mills
No. 211909498

Nathalie S. Skibine, Attorney for Appellant

Derek E. Brown and Jonathan S. Bauer,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN D. TENNEY and AMY J. OLIVER concurred.

MORTENSEN, Judge:

¶1 Late at night in a residential neighborhood, Levon Garo Meguerditchian fired several shots at a vehicle that had just left a party at his home. He was responding to a supposed theft of a bottle of vodka, but it turned out the alleged thieves were in a different vehicle. Knowing police might soon be summoned, Meguerditchian and others quickly collected the shell casings, and Meguerditchian and his wife ordered other partygoers—who were minors—back into the house and ultimately into a hiding place to keep them from being discovered by police.

¶2 Meguerditchian would later learn that he killed the driver. He was charged with murder, felony discharge of a firearm, obstruction of justice, and multiple counts of aggravated

kidnapping. Now on appeal, Meguerditchian claims the district court erred in not granting a motion for a directed verdict on several of the aggravated kidnapping counts. He further claims he received ineffective assistance, asserting his counsel should have moved to exclude certain evidence and should not have stipulated to the introduction of body camera footage. Finally, Meguerditchian claims the district court erred in refusing to give instructions on mistake of fact and voluntary intoxication. We reject all these claims and affirm the convictions.

BACKGROUND[1]

*The Murder and Kidnappings*

¶3      Meguerditchian hosted a party at his house in August 2021. Among those present were Carl and his minor girlfriend, Lydia.[2] Other minors at the party included Jane, Dennis, Ursula, and Steve.

¶4      The party proceeded without incident, with the attendees drinking and dancing until around 3:30 a.m., when some girls at the party allegedly stole a bottle of vodka and were seen leaving the house. Meguerditchian's niece (Niece) pursued the girls outside as they ran to their vehicle. At about the same time, Carl left the house and went to his car. The girls then drove off, with Carl leaving in his car shortly thereafter. Meanwhile, Niece informed Meguerditchian about the vodka theft. Meguerditchian ran to the backyard, apparently to retrieve something, and then went out the front door and pulled out a gun. As Carl was driving

_____

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (cleaned up).

2. For ease of reading, we use pseudonyms rather than initials for the murder victim and the minors involved in this case.

away, Meguerditchian fired two or three shots at his car. The sound of a car crashing about two seconds later can be clearly heard on the video from a nearby doorbell camera. Two neighborhood eyewitnesses identified the likely shooter as a man wearing a black shirt with writing on it that was white or neon orange or neon green. Meguerditchian and his wife (Wife) then told the partygoers who had gone outside to "get the fuck inside." While Meguerditchian apparently did not realize it at the time, one of the bullets he fired struck Carl in the head and killed him. Carl's car had traveled about half a block before it crashed into a house around the corner.

¶5 After going into the house, Meguerditchian and Wife had Lydia go outside with them to look for casings from the rounds that were fired. When they went back inside the house, Wife told everyone to stop using their phones. Nevertheless, Lydia began calling Carl's number and "begged" for permission to leave to go look for him. Although Meguerditchian and Wife initially "weren't letting anyone leave," Meguerditchian eventually allowed Lydia to leave to look for Carl. She went to Carl's house to see if his car was there, but she did not see it.

¶6 A neighbor who had heard the gunshots and had seen people leaving the party called the police. When officers arrived shortly after 4:00 a.m., Meguerditchian and Wife directed several partygoers, including Ursula, Dennis, Jane, and Steve, into a closet or laundry room, where they were held for twenty to forty minutes. Meanwhile, Meguerditchian went out and spoke with the officers, who told him they were responding to reports of someone with a gun shooting at a car. As relevant here, Meguerditchian was wearing a black t-shirt with neon green lettering that read, "Do I look like I give a fuck?" Meguerditchian lied to the police, telling one of the officers that he heard a "couple of bangs" that sounded "more like fireworks than gunshots." Meguerditchian mentioned nothing about his involvement in the shooting and did not claim that he acted in self-defense.

¶7 After the police left, Meguerditchian went inside and—along with Wife—began to interrogate the partygoers about who had invited the girls allegedly responsible for taking the alcohol. Jane admitted that she had invited one of the girls, which led her to be "targeted" by Meguerditchian, Wife, and Niece. While hovering over Jane, Wife made Jane go through all her phone contacts in an effort to determine if she had texted anyone about the alcohol theft. Wife then took Jane's phone and started choking her. On Meguerditchian's orders, Wife forced Jane into an upstairs bedroom. Once in the bedroom, Wife began hitting Jane, slapping her, punching her in the face, and kneeling on her stomach, all while continuing the questioning. At some point, a "very angry" Meguerditchian entered the bedroom and "grabbed something off the dresser and hit [Jane] very hard on [her] head." He struck her a second time with his fist. During this time, Meguerditchian also threatened to put his gun, which he had brandished, in her mouth.

¶8 Lydia returned to the house after looking for Carl. By this point, the partygoers—with the exception of Jane—were outside the house. The group knocked on the door to see if Jane was inside, but Meguerditchian came out and told them that she had left with some boys, an assertion that he knew was untrue since he had just taken part in her interrogation in the house. While Lydia was charging her phone on the front porch, Meguerditchian left the house, apparently to get some cocaine. Lydia and Dennis took the opportunity to go into the house to find Jane, and they concluded that she was with Wife. Meguerditchian returned at this point, and Dennis confronted him: "We know she's in the house. Bring her out." Meguerditchian responded by hitting Dennis. Lydia and Dennis then called the police. Meanwhile, Wife escorted Jane out of the house and to a neighbor's garage.

¶9 At around 7:00 a.m., police again arrived at the house. It was around this same time that Lydia found Carl's crashed car and his lifeless body around the corner from the house. When

officers arrived at the crashed car, they had to pull Lydia out of the open driver side as she clung to Carl's body. A few minutes later, Meguerditchian lied to police officers by telling them that Jane had left the house hours before. In fact, Meguerditchian knew Jane was with Wife in the neighbor's garage because he had been texting Wife about the situation. Again, Meguerditchian made no mention of his involvement in the shooting and did not assert that he had acted in self-defense. A few hours later, police officers discovered Jane and Wife in the neighbor's garage.

¶10    Meguerditchian was arrested and interviewed at the police station. In that interview, he said that he was told at one point during the party that a bottle of vodka had been stolen, but he insisted that he remained on the porch of his house even after others ran out toward the street. He told the detective that the entire incident wasn't really about the bottle of stolen vodka but about having people in his house who would steal from him. He denied knowing anything about the shooting and asserted that he did not fire a gun during the events. He repeated his initial statement that he heard some "bangs" that sounded like "fireworks."

¶11    As relevant to this appeal, Meguerditchian was charged with murder, felony discharge of a firearm, obstruction of justice, and five counts of aggravated kidnapping for his actions related to Jane, Lydia, Ursula, Steve, and Dennis.

*The Trial*

¶12    In its opening statement, the State summarized Meguerditchian's actions as described above, focusing in particular on the shooting that caused Carl's death and the corralling and detention of the partygoers in the house—all in response to a bottle of stolen vodka. The prosecutor then posed this rhetorical statement:

> [Y]ou may still be wondering, why does it make sense that he would do this over a bottle of alcohol? But in his own words with police afterwards, "I don't think it's about the bottle of vodka. It's about having people in our home that's going to steal from us." Or maybe he really doesn't care about that vodka. Maybe he really doesn't care about [Carl]. Maybe he doesn't care about [Lydia] or the others. Maybe it's just like the neon green words on the back of his black shirt suggests, "Do I look like I give a fuck?"

Meguerditchian's counsel (Counsel) did not object to this statement. Instead, he argued that Meguerditchian had heard a gunshot and, believing Niece was in danger, "pulled out his pistol and . . . fired in defense of himself, in defense of his niece, and defense of his home." Counsel also argued that it was Wife—not Meguerditchian—who threatened the partygoers, insisting that he "wasn't even there" to see the things going on inside the house: "He's no accomplice to kidnapping or anything of that sort, because he wasn't there and he didn't even know about it."

¶13 The State then presented its case by first offering the testimony of responding police officers and one officer's body camera video of finding Carl's car. Counsel indicated he had reviewed the exhibit of the body camera video and stipulated to its admission, and he stipulated to the admission of photographs of the car's bloody interior and Carl's body on the sidewalk after he had been removed from the car.[3]

---

3. Prior to the arrival of the jury, Counsel informed the court that he was "getting rid of a lot of [the State's] witnesses" with "a bunch of stipulations." Accordingly, the stipulation to the

(continued…)

¶14  Before the video was shown, the officer (whose body camera had recorded the video of the crash scene) described how he had discovered Lydia leaning into the crashed car over Carl's body. He said that Lydia was crying and saying, "He's gone." He further testified how he and another officer removed Carl from the car and performed CPR to try to revive him. The video showed the officer's view as he walked toward the wrecked vehicle and then forcibly pulled Lydia—who was visibly distressed and clutching Carl's body—from the car. Afterward, the officer is shown assisting other officers in removing Carl's body from the vehicle to administer CPR.

¶15  The other partygoers then testified consistently with the events as detailed above. The State also presented video taken by a nearby house's doorbell camera showing the girls who allegedly stole the alcohol driving away from Meguerditchian's house in their car, followed shortly thereafter by Carl leaving in his car. This doorbell video also depicted Meguerditchian firing at Carl's car as he left. Two shots can be heard on the recording, followed about two seconds later by the sound of a loud crash off screen.

¶16  After the State rested, Meguerditchian moved for a directed verdict on the aggravated kidnapping charges, arguing that there was insufficient evidence that he was responsible for detaining the partygoers, either directly or as an accomplice. The court denied the motion.

admission of the evidence, including the body camera video, appears to have constituted an intentional strategic attempt to limit the number of witnesses the State would call to testify. Indeed, the officer whose body camera video of the crash scene was played testified only briefly (roughly seven pages of transcript) about the crash scene before the video was played for the jury.

¶17    Meguerditchian then testified in his own defense. He stated that when he heard Niece say that she had been robbed, he got his gun and ran outside, where he thought he saw Niece "literally . . . getting drug under a car." He admitted that he fired shots at Carl's car, but he asserted that he had first heard what "sounded like a gunshot." He stated that he was "irate," was under the influence of alcohol, and fired in the direction of Carl's car "just to neutralize the situation." However, he denied that he was "shooting at someone specifically." He admitted that he told everyone to get inside the house after the shooting, but he claimed to do so only because he thought it was dangerous for them to be outside. He said that he lied to the police about the gunshots being fireworks because he "didn't want to make it a bigger deal" than it was and he wanted to "avoid problems." He denied that he ordered anyone into a closet, threatened anyone, or held the partygoers against their will. He also denied any involvement in assaulting Jane. He admitted that he gave the gun he had fired to a friend shortly after the shooting. The defense rested after Meguerditchian testified.

¶18    The court then instructed the jury on the elements of each charge, on self-defense, on defense of others, and on extreme emotional distress. The jury also received instructions on the State's burden to prove each element and on the required mental state. Meguerditchian had requested two additional instructions related to mental state. First, he asked for a voluntary intoxication instruction, which stated in relevant part, "Intoxication, due to the consumption of alcohol or drugs is a defense if there is reasonable doubt that the defendant acted intentionally or knowingly because he was intoxicated." Second, he asked for a mistake-of-fact instruction: "An act committed or an omission made under an ignorance or mistake of fact which disproves the culpable mental state is a defense for that crime." As to the voluntary-intoxication instruction, the court noted that there had to be evidence suggesting more than just that Meguerditchian was impaired by his alcohol use. *See State v. Bell*, 2016 UT App 157,

¶ 30, 380 P.3d 11 ("It is not enough to merely present evidence showing that the defendant was intoxicated. Rather, to establish a viable voluntary intoxication defense, the defendant must point to evidence showing that he was so intoxicated that he was incapable of forming the requisite mental state for the crimes committed." (cleaned up)). Accordingly, the court declined to give the instruction because Meguerditchian had not "presented sufficient evidence to support a voluntary intoxication defense." Concerning the mistake-of-fact instruction, the court declined to provide it because "the other instructions" gave "sufficient . . . direction" to address the required mental state.

¶19  In its closing argument, the State twice referenced the message on Meguerditchian's t-shirt, which Meguerditchian was shown wearing in photographs and in body camera video that had been admitted into evidence. First, the prosecutor stated,

> Now, this question [namely, "Do I look like I give a fuck?"] is rhetorical. Obviously it answers itself. I submit to you that's his answer with regards to whether he's willing to tell the truth to the police or to you. I submit that that is his answer about who is going to die when he pops off two shots in his neighborhood, homes everywhere, car driving away, a car that he likely thought just had a half bottle of [vodka] in it. I submit to you that that's his answer to the pain that [Jane] suffered when he hit her at least twice and when he told her to open her mouth so he could put his gun in it. I submit to you that that's his answer to detain minors so that they can't talk to the police and implicate him firing two rounds in his neighborhood and in concealing evidence of his crimes.

And in his rebuttal, the prosector again referenced the question on Meguerditchian's shirt: "So give him the answer to what's on the back of his shirt and find him guilty."

¶20   As relevant here, the jury convicted Meguerditchian of felony discharge of a firearm, obstruction of justice, and murder, specifically rejecting his claims of imperfect self-defense, defense of others, defense of habitation, and extreme emotional distress. It also convicted him of aggravated kidnapping of Jane, concluding that he had the intent to hinder the reporting of a felony and to inflict bodily injury on her. And he was convicted on four counts of aggravated kidnapping for unlawfully detaining Lydia, Dennis, Ursula, and Steve with the intent to hinder the reporting of a felony. Meguerditchian appeals.

ISSUES AND STANDARDS OF REVIEW

¶21   Meguerditchian first claims that the district court erred when it denied his motion for a directed verdict on the four aggravated kidnapping charges related to Lydia, Dennis, Ursula, and Steve. We review the denial of a motion for a directed verdict for correctness. *State v. Garcia*, 2025 UT App 119, ¶ 23, 576 P.3d 1111, *cert. denied*, 581 P.3d 555 (Utah 2025). But "when a defendant challenges the denial of a motion for a directed verdict based on the sufficiency of the evidence, the applicable standard of review is highly deferential, and we will uphold the district court's denial if, when viewed in the light most favorable to the State, some evidence exists from which the elements of the crime could be proven beyond a reasonable doubt." *State v. Graydon*, 2023 UT App 4, ¶ 26, 524 P.3d 1034 (cleaned up).

¶22   Meguerditchian next asserts that he received ineffective assistance of counsel in several ways: (1) Counsel failing to (a) move to exclude evidence of the writing on Meguerditchian's t-shirt or (b) object to the prosecutor's comments about the message that writing conveyed and (2) Counsel stipulating to the

admission of body camera video of Lydia clinging to Carl and officers finding Carl in his crashed car and attempting to resuscitate him. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Johnson*, 2025 UT App 63, ¶ 23, 569 P.3d 1082 (cleaned up).

¶23 Meguerditchian's third claim is that the court erred in declining to instruct the jury on voluntary intoxication or mistake of fact. "The refusal to give a jury instruction is reviewed for abuse of discretion, although in some circumstances that discretion will be narrowly constrained. That is, in certain circumstances a district court's discretion will be constrained such that a party is legally entitled to have a particular instruction given to the jury. In those circumstances, refusal constitutes an error of law, and an error of law always constitutes an abuse of discretion." *State v. Farmer*, 2025 UT App 57, ¶ 40, 569 P.3d 267 (cleaned up), *cert. denied*, 574 P.3d 522 (Utah 2025); *see also State v. Hunt*, 2025 UT 54, ¶¶ 45–46, 582 P.3d 772 (stating that whether the point of a proposed instruction "is properly covered in other instructions" falls "within the district court's discretion" and is "subject to an abuse of discretion standard" but that "other jury instruction issues will present a question of law, subject to a correctness standard," such as whether "the defendant was legally entitled" to an instruction on "an affirmative defense for which there was an evidentiary basis" (cleaned up)).

¶24 Finally, Meguerditchian asserts that the cumulative effect of the alleged errors was prejudicial. "Under the cumulative error doctrine, we apply the standard of review applicable to each underlying claim of error. And we will reverse only if the cumulative effect of the several errors undermines our confidence that a fair trial was had." *State v. McNeil*, 2013 UT App 134, ¶ 16, 302 P.3d 844 (cleaned up), *aff'd*, 2016 UT 3, 365 P.3d 699.

ANALYSIS

I. Denial of Directed Verdict

¶25  Meguerditchian first asserts that the district court erred in denying his motion for a directed verdict on the four kidnapping charges related to Lydia, Dennis, Ursula, and Steve, arguing that the evidence was insufficient to sustain those convictions. More specifically, Meguerditchian claims that there was no evidence that he intended that the four minors be detained or that he was a party to the offense. We conclude that this issue is inadequately briefed. But the reason for that inadequacy is somewhat nuanced and thus requires explanation.

¶26  Meguerditchian was convicted of aggravated kidnapping with respect to the four minors. "An actor commits aggravated kidnapping if the actor, in the course of committing *unlawful detention* or *kidnapping* . . . acts with the intent to. . . hinder or delay the discovery of or reporting of a felony . . . ." Utah Code § 76-5-302(2)(b)(iii) (emphasis added). Thus, as relevant here, two alternative underlying offenses could support a conviction for aggravated kidnapping: unlawful detention and kidnapping. Significantly, the elements of unlawful detention differ somewhat from those of kidnapping:

- "An actor commits unlawful detention of a minor if the actor is at least four or more years older than the minor, and intentionally or knowingly, without authority of law, and against the will of the minor, *coerces or exerts influence over the minor* with the intent to cause the minor to remain with the actor for an unreasonable period of time under the circumstances." *Id*. § 76-5-304(2)(b) (emphasis added).

- "An actor commits kidnapping if the actor intentionally or knowingly, without authority of law, and against the will of an individual . . . *detains or restrains* a minor without the consent of the minor's parent or legal guardian or the

consent of a person acting in loco parentis . . . ." *Id*. § 76-5-301(2)(d) (emphasis added).

As is obvious from the text of the statutes, kidnapping is the more egregious offense in the sense that it requires the actor to detain or restrain the minor, while unlawful detention requires only coercion or exerting influence to cause the minor to remain with the actor. *See State v. Wilder*, 2016 UT App 210, ¶ 20, 387 P.3d 512 ("While the 'kidnapping' alternative under the aggravated kidnapping statute may require detaining or restraining the victim . . . , the 'unlawful detention' alternative does not." (cleaned up)), *aff'd*, 2018 UT 17, 420 P.3d 1064. In other words, unlawful detention focuses on exerting psychological manipulation or pressure over a minor and does not require the physical force or restraint characteristic of kidnapping.

¶27 Meguerditchian was convicted of aggravated kidnapping of the four minors under the unlawful detention alternative of the statute. But on appeal, Meguerditchian focuses almost exclusively on the element of detention in the kidnapping alternative. Specifically, he argues that "the State presented no evidence for the essential element of detention" so the court erred when it denied the directed verdict motion on the four aggravated kidnapping charges. And while Meguerditchian acknowledges that he was convicted under the unlawful detention alternative, he makes no attempt to address the specific elements of that alternative as identified in the statute—namely, coercing or exerting influence over the minors to cause them to remain with him. *See* Utah Code § 76-5-304(2)(b). Instead of addressing the elements of unlawful detention head on, Meguerditchian essentially conflates these elements with the "detains" element of kidnapping. Given this oversight—or perhaps lack of precision—we conclude this issue is inadequately briefed. "Briefs must contain reasoned analysis based upon relevant legal authority. An issue is inadequately briefed when the overall analysis of the issue is so lacking as to shift the burden of research and argument to the

reviewing court." *State v. Sloan*, 2003 UT App 170, ¶ 13, 72 P.3d 138 (cleaned up). This is what has happened here. Meguerditchian's briefing regarding the unlawful detention alternative—which was the basis of his conviction—is so superficial and cursory that it does not offer a substantive foundation for us to examine this issue. Given this fundamental deficiency, we decline to thoroughly examine this claim of error.[4]

---

4. Nevertheless, had we considered this issue substantively under the kidnapping alternative, we would have concluded that the district court did not err in denying the directed verdict motion. We will affirm a denial for a directed verdict "if, when viewed in the light most favorable to the State, *some* evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Andrus*, 2025 UT 32, ¶ 27, 575 P.3d 1071 (cleaned up).

And the State certainly provided some evidence that Meguerditchian "unlawfully detained or restrained" the four minors and "did so intentionally or knowingly." *State v. Wright*, 2019 UT App 66, ¶ 38, 442 P.3d 1185 (cleaned up). "'Detains or restrains' refers to restriction of the victim's movement," but these terms do not require "complete confinement or imprisonment." *Id.* (cleaned up). Accordingly, the State needed to prove only that Meguerditchian "intentionally acted, however briefly, to impair the [four minors'] ability to move freely." *Id.* (cleaned up). The State presented evidence that Meguerditchian knowingly detained the four minors in his home following a shooting and that he was a party to Wife's efforts to do the same. Testimony confirmed that Meguerditchian and Wife ordered the group to "get the fuck inside" after the shooting. Even when Lydia returned to the house after helping Meguerditchian and Wife look for shell casings, she had to beg for permission to go and find Carl because "they weren't letting anyone leave."

(continued…)

## II. Ineffective Assistance Claims

¶28    Meguerditchian next argues that he received ineffective assistance concerning the message on his t-shirt and the stipulation to showing the body camera video taken when officers discovered Carl dead in his car.

---

While Meguerditchian argues that Lydia was not detained because he eventually granted her permission to leave to find Carl, this permission merely marked the end of her detention. It does not negate the evidence that, prior to being released, she was held against her will along with the other minors. And even if Wife directed much of the activity related to detaining the minors (e.g., forcing them to hide in a closet or laundry room) while Meguerditchian went out to speak with the police responding to the report of shots being fired, the record is clear that Meguerditchian participated and assisted in the activity. *See State v. Briggs*, 2008 UT 75, ¶ 13, 197 P.3d 628 ("To show that a defendant is guilty under accomplice liability, the State must show that an individual acted with both the intent that the underlying offense be committed and the intent to aid the principal actor in the offense."). Indeed, in his directed verdict motion on this point, Counsel admitted that there was some evidence that Meguerditchian was a party to the offense: "The witnesses that we had said that there was conflicting evidence. Some of them said that [Wife] told them to get in the closet. But one witness said that [Meguerditchian] asked them to get in the closet so that the cops wouldn't see them." Thus, even Meguerditchian's framing of the directed verdict motion conceded that that there was *some* evidence—albeit conflicting in his estimation—of his participation in the kidnapping of the minors.

And, we might add, if there was some evidence that Meguerditchian kidnapped the four victims, there is, a fortiori, some evidence to support the unlawful detention alternative.

¶29 "A defendant asserting ineffective assistance of counsel must meet the two-prong *Strickland* test: (1) counsel's performance was objectively deficient and (2) the deficient performance resulted in prejudice." *State v. Chase*, 2025 UT App 158, ¶ 43, 580 P.3d 421 (cleaned up), *cert. denied*, 581 P.3d 560 (Utah 2025). "And we need not address both *Strickland* prongs where we can dispose of the claim on one of the prongs." *Id.*

¶30 To establish deficient performance, a defendant "must demonstrate counsel's representation fell below an objective standard of reasonableness." *State v. Sandoval*, 2024 UT App 186, ¶ 19, 562 P.3d 731 (cleaned up). "The deficient performance inquiry should focus on whether counsel's assistance was reasonable considering all the circumstances, and it must indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Id.* (cleaned up). And "if an attorney's decisions can be explained by a reasonable trial strategy, the defendant has necessarily failed to show deficient performance." *State v. Hunter*, 2021 UT 44, ¶ 68, 496 P.3d 119 (cleaned up). "The ultimate question is not whether some strategy other than the one that counsel employed looks superior given the actual results of trial but, rather, whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial." *State v. Mendoza*, 2025 UT App 140, ¶ 27, 585 P.3d 140 (cleaned up).

¶31 To show prejudice, "the defendant must present sufficient evidence to support a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Miller*, 2023 UT App 85, ¶ 27, 535 P.3d 390 (cleaned up). "In evaluating whether prejudice exists, we consider the totality of the evidence, taking into account such factors as whether the errors affect the entire evidentiary picture or have an isolated effect and how strongly the verdict is supported by

the record." *State v. Griffin*, 2015 UT 18, ¶ 21, 441 P.3d 1166 (cleaned up).

A.      Not Objecting to the Admission of the T-Shirt Message

¶32     Meguerditchian first asserts that Counsel's performance was deficient because he should have "objected to the jury learning the content of the writing on the t-shirt." He argues that the writing was "inadmissible" under rule 403 of the Utah Rules of Evidence, which enables a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Specifically, he claims that the writing was unfairly prejudicial because it cast him in a bad light before the jury. And he suggests that the "content of the writing could have been redacted without affecting" the probative value of the evidence.[5]

¶33     We assume for the sake of argument that Counsel should have objected to the message on the t-shirt being admitted. Even so, Meguerditchian has not established he was prejudiced by the jury learning the content of the t-shirt's message. In other words, he has not persuaded us that "the result of the proceeding would have been different," *see Miller*, 2023 UT App 85, ¶ 27 (cleaned up), because he has not shown a reasonable likelihood that even if he had succeeded in redacting all photographs and videos that included the t-shirt message, he would have received a more favorable outcome in light of the overwhelming evidence against him.

¶34     The evidence of Meguerditchian's guilt included doorbell camera video of him shooting at Carl's car and the absence of a

---

5. In fact, the message on the t-shirt also appears repeatedly in body camera video of Meguerditchian talking with police officers. On appeal, Meguerditchian makes no attempt to explain how these other instances of the t-shirt message being shown could have effectively been redacted.

gunshot preceding this action, directly contradicting his claim of self-defense. And there were multiple corroborated accounts of Meguerditchian participating in the unlawful detention of the minors. Moreover, there was uncontroverted evidence that Meguerditchian lied to the police to cover up these two crimes. He fabricated an explanation that the gunshots—that he fired—sounded "more like fireworks," all to dissuade police officers from investigating further when they went to his house the first time. And he again lied to the police when they asked about Jane, telling them that she had left hours before even though he knew Wife was holding her captive in their neighbor's garage. This evidence led to but one conclusion for the jury: Meguerditchian shot and killed Carl, detained witnesses to prevent them from reporting the shooting to the police, and then repeatedly lied to cover up the crimes. In other words, the problem for Meguerditchian arose not from the devil-may-care message on his shirt but from the overwhelming evidence of his guilt. Accordingly, this claim of ineffective assistance fails under *Strickland*'s prejudice prong.

B.     The Prosecutor's Remarks About the T-Shirt Message

¶35     Meguerditchian also argues that Counsel should have objected when the prosecutor referred to the message on the t-shirt. He asserts that in making these remarks, the prosecutor called the jurors' attention to matters that they should not have considered in reaching a verdict. Specifically, Meguerditchian claims that "[d]rawing inferences about a life philosophy based on the t-shirt was not a justifiable basis for a verdict" and that the "only possible relevance the writing had was as impermissible evidence of character."

¶36     In both opening statements and closing arguments, "[c]ounsel for both sides have considerable latitude." *State v. Houston*, 2015 UT 40, ¶ 76, 353 P.3d 55 (cleaned up); *see also State v. Erwin*, 120 P.2d 285, 313 (Utah 1941) ("The purpose of an

opening statement is to advise the jury of the facts relied upon and of the questions and issues involved, which the jury will have to determine, and to give them a general picture of the facts and the situations, so that they will be able to understand the evidence." In this context, attorneys "have the right to fully discuss from their perspectives the evidence and all inferences and deductions it supports." *State v. Reid*, 2018 UT App 146, ¶ 49, 427 P.3d 1261 (cleaned up). "And the law recognizes the prerogative of opposing counsel to swallow their tongue instead of making an objection that might have the risk of highlighting problematic evidence or even just annoying the jury." *State v. Hummel*, 2017 UT 19, ¶ 110, 393 P.3d 314. Indeed, our review of ineffective assistance claims in this context centers not on "whether the prosecutor's comments were proper, but whether they were so improper that counsel's only defensible choice was to interrupt those comments with an objection." *Reid*, 2018 UT App 146, ¶ 49 (cleaned up).

¶37 The prosecutor's comments regarding Meguerditchian's t-shirt did not rise to the level that Counsel's only choice was to object. Counsel could have reasonably determined that the prosecutor was operating within the broad latitude allowed for commenting on the evidence. In both the opening statement and the closing argument, the thrust of the prosecutor's references to Meguerditchian's t-shirt suggested that his behavior demonstrated an indifference to the welfare of others. This argument was supported by Meguerditchian's violent reactions—specifically shooting at Carl's car, kidnapping minors, and beating Jane—being disproportionate to the alleged vodka theft that precipitated the conflict. In short, it was permissible for the prosecutor to argue that the evidence indicated Meguerditchian's lack of care for his victims and to point out that this attitude was consistent with the message on his t-shirt. A competent attorney could reasonably conclude that objecting would serve only to highlight the t-shirt's profane message rather than to change the overall evidentiary landscape or arguments presented to the jury.

¶38 As with the admission of the t-shirt message itself, Meguerditchian has likewise not demonstrated sufficient prejudice arising from the prosecutor's statements about how it revealed Meguerditchian's attitude. To put it bluntly, it was Meguerditchian's calloused actions of shooting a teenager over a stolen bottle of vodka and then detaining multiple minors to conceal his misdeeds that established his indifference to human life and selfish disrespect for other human beings. The prosecutor's comments about the t-shirt message merely drove home a point that was already abundantly clear from the evidence. In short, Meguerditchian was convicted on the evidence of his actions, not the prosecutor's commentary on the t-shirt message.

¶39 Accordingly, Meguerditchian has not shown deficient performance or prejudice, so this claim of ineffective assistance necessarily fails.

C.     Body Camera Video of the Crash Scene

¶40 Meguerditchian next argues that Counsel should have objected to the introduction of body camera video "showing an emotional scene where the police had to pull [Lydia] from [Carl], extract him from the crashed car, and perform CPR." He argues that "[w]hatever minimal probative value the video might have had was substantially outweighed by the danger of unfair prejudice" by creating "sympathy for [Carl] while generating horror and contempt for Meguerditchian, who did not dispute that he fired the shot that killed" Carl. Notably, Meguerditchian makes no claim Counsel should have objected to the officer's description of the scene—including Lydia's emotional state and the efforts to revive Carl by administering CPR—or to the admission of photographs of the bloody interior of the car and Carl's body on the sidewalk.

¶41 When evaluating whether counsel rendered deficient performance for failing to object to evidence under rule 403, the

legal standard requires more than proving the evidence was objectionable in the abstract. Instead, the inquiry focuses on "whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial." *Mendoza*, 2025 UT App 140, ¶ 27 (cleaned up). In the context of stipulated evidence, deficient performance takes on an added layer because this circumstance requires us to consider whether "[c]ounsel's decision to enter into the stipulation . . . was unquestionably a strategic one." *State v. James*, 2026 UT App 20, ¶ 40, 586 P.3d 551, *petition for cert. filed*, Apr. 13, 2026 (No. 20260421). This is because "an attorney's reasonably informed strategic choices are almost unassailable in a deficient performance inquiry." *Id.* ¶ 39 (cleaned up). Accordingly, a "decision by counsel that reasonably weighs the risks and benefits of available strategic approaches before choosing one as preferable to others cannot support a claim that counsel was deficient in either strategy or performance, even if the approach did not lead to the desired result. In such cases, so long as counsel could have reasonably chosen the strategy in question, and so long as the strategy is itself reasonable, the claim must fail." *State v. Rivera*, 2022 UT App 44, ¶ 38, 509 P.3d 257 (cleaned up).

¶42 Here, we perceive no deficient performance in Counsel's action because the record indicates that Counsel had a deliberate strategic purpose in mind when he stipulated to the admission of the video. Indeed, Counsel explicitly stated as much when he told the district court that he was "getting rid of a lot of [the State's] witnesses" with "a bunch of stipulations." This statement leaves little doubt that the stipulation to the admission of the evidence, including the body camera video, constituted an intentional strategic attempt to limit the number of witnesses the State would call to testify. By agreeing that the video could be played, Counsel was able to avoid the parade of witnesses who would have described the emotional crash scene in painstaking detail. Moreover, we do not know exactly what was traded away in the bargain Counsel struck with the State by way of stipulation, but

we have to presume that it was worthwhile and reflected sound trial strategy. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984) ("Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (cleaned up)).

¶43 Admittedly, the video was not obviously beneficial to Meguerditchian's case, but it was brief and it seems likely that Counsel determined that showing it was better than having multiple witnesses describe the scene before the jury—which may have been even more detrimental to Meguerditchian's case—in addition to side-stepping whatever else was avoided by way of the stipulation. After all, there was abundant evidence related to the crash scene, including photographs depicting Carl's body on the sidewalk after police officers had removed him from the crashed car and photographs of the the bloody interior of the car. In stipulating to the video, Counsel likely sought to avoid the jury's exposure to even more such evidence. And we have to assume that the trade was worthwhile and represented a sound tactical strategy on Counsel's part. *See id.* With the video, the evidence was at least presented in a succinct and contained manner, thus avoiding protracted witness testimony that would have served only to emphasize the tragic results of Meguerditchian's actions. And just because a different attorney might have chosen another path, that possibility, standing alone, does not mean that Counsel's decision to stipulate to admission of the video was deficient. *See id.* ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.").

¶44 Therefore, given the strategically motivated stipulation to its admission, we see no deficiency in Counsel's performance with

respect to this video. Accordingly, this claim of ineffective assistance fails for lack of deficient performance.

### III. Denial of Requested Jury Instructions

¶45    Meguerditchian next claims that the court erred when it declined to provide two of his requested jury instructions.

¶46    First, he asserts that the court should have given his instruction on mistake of fact, which stated, "An act committed or an omission made under an ignorance or mistake of fact which disproves the culpable mental state is a defense for that crime." Meguerditchian argues that "[m]istake of fact was an important concept that the court needed to clarify for the jury" because his "defense to murder and felony discharge of a firearm was centered on the claim that, although he was ultimately mistaken, [he] believed that a serious robbery, possibly involving a dangerous weapon, had just occurred and that someone had fired a gun before [he] returned fire in that direction." He also claims that mistake of fact was important regarding the four kidnapping charges. On this point, Meguerditchian claimed he wanted everyone to go inside based on his belief that they might have been in danger if they remained outside, which would negate his intent to unlawfully detain anyone. As to the kidnapping of Jane, he claims the mistake-of-fact instruction was important because it would have negated his intent to aid in her kidnapping if the jury believed that he was mistaken about the reason she was being kept under the supervision of Wife.

¶47    Second, Meguerditchian asserts that the court erred in declining to give the jury his proposed instruction on voluntary intoxication, which provided that "[i]ntoxication, due to the consumption of alcohol or drugs is a defense if there is reasonable doubt that the defendant acted intentionally or knowingly because he was intoxicated." Meguerditchian argues that because he had testified that he was under the influence of alcohol at the time of the incident, there was "evidence that he did not have the

culpable mental state for the charged crimes" and the jury should have been so instructed.

¶48 Thus, Meguerditchian argues, the mistake-of-fact and voluntary-intoxication instructions would have informed the jury to acquit him if he lacked the culpable mental state to commit the crimes he was charged with. We are not persuaded.

¶49 We review jury instructions "in their entirety to determine whether the instructions, taken as a whole, fairly instructed the jury about the applicable law." *State v. Seach*, 2021 UT App 22, ¶ 17, 483 P.3d 1265 (cleaned up). And while "we review the trial court's failure to give requested jury instructions for correctness, granting the trial court no particular deference in its determination," we will reverse only if omission of the proposed instruction "tends to mislead the jury to the prejudice of the complaining party or insufficiently or erroneously advises the jury on the law." *State v. Stringham*, 2001 UT App 13, ¶ 17, 17 P.3d 1153 (cleaned up). Even if certain jury "instructions could have been slightly more accurate or more complete does not mean they were inaccurate, incomplete, or erroneous—nor does it mean they were prejudicial." *State v. Nelson*, 2015 UT 62, ¶ 47, 355 P.3d 1031. As our supreme court recently stated,

> A party is not entitled to have the jury instructed with any particular wording. So long as they correctly state the law, the precise wording and specificity of jury instructions is left to the sound discretion of the trial court. Moreover, a district court does not necessarily abuse its discretion when it refuses to give *every* instruction requested by a party. To the contrary, if the point is properly covered in other instructions, and the instructions, read as a whole, fairly instruct the jury on applicable law, the court has discretion to refuse a request for a particular jury instruction.

*State v. Hunt*, 2025 UT 54, ¶ 60, 582 P.3d 772 (cleaned up). Moreover, "while a criminal defendant is entitled to have the jury instructed on the law underlying his or her theory of the case if the evidence supports such an instruction, a defendant has no right to multiple instructions setting forth his or her theory of the case." *State v. Miller*, 727 P.2d 203, 206 (Utah 1986) (cleaned up); *see also State v. Kennedy*, 2015 UT App 152, ¶ 32, 354 P.3d 775 ("[T]he defense is not entitled to further instruction regarding the defense's theory of the case when the other instructions already fairly instruct the jury on the law applicable to that theory.").

¶50 In the present case, Meguerditchian's proposed instructions addressed the necessity of finding that he acted with a culpable mental state. But the existing instructions adequately addressed this very issue. Indeed, the instructions provided to the jury defined reasonable doubt and the presumption of innocence, explained the State's burden to prove Meguerditchian's mental state, defined the various levels of mental culpability, and outlined the elements of the charged crimes—including murder, aggravated kidnapping, obstruction of justice, and felony firearm discharge—requiring the State to prove the necessary mental state for each beyond a reasonable doubt. Because the general instructions regarding the necessary mental state and the elements of the crimes were sufficient to guide the jury on the defenses of mistake of fact and voluntary intoxication, the district court did not err in declining to give the unnecessarily duplicative instructions on those points as requested by Meguerditchian.

¶51 And concerning the voluntary-intoxication instruction, we see no error in the district court's conclusion that Meguerditchian was not even entitled to such an instruction. "To prevail on a voluntary intoxication defense, . . . it is not enough to merely present evidence showing that the defendant was intoxicated. Rather, to establish a viable voluntary intoxication defense, the defendant must point to evidence showing that he was so intoxicated that he was incapable of forming the requisite mental

state for the crimes committed." *State v. Bell*, 2016 UT App 157, ¶ 30, 380 P.3d 11 (cleaned up). While there was evidence that Meguerditchian was drinking and may have been intoxicated, the evidence simply did not show that his intoxication vitiated his intent to fire his gun at Carl's car or detain the minors. *Cf. id.* ¶ 32 (concluding that the defendant was not entitled to a voluntary-intoxication instruction when, among other things, neither the defendant "nor anyone else testified that his intoxication caused him to think he was wielding a carrot rather than a knife"). Despite the evidence showing that Meguerditchian was agitated and angry—and it can be inferred that those emotions were perhaps exacerbated by his consumption of alcohol—there is no evidence that he was so drunk that he was acting without the requisite mental state. To the contrary, the evidence suggests that Meguerditchian very much had his wits about him. After all, he was able to shoot at and hit the driver of a car speeding away, organize others to search for spent shell casings, detain minors so that they wouldn't reveal his crime to the police, stash the gun he had used to kill Carl, and repeatedly lie to the police as they investigated the shooting. These are not the actions of a man who was so intoxicated as to be deprived of the necessary mental state.

### IV. Cumulative Prejudice

¶52  Meguerditchian also asserts that the cumulative effect of the purported errors he alleges on appeal was prejudicial. "Sometimes, an appellant may show prejudice when a single error may not constitute grounds for reversal, but many errors, when taken collectively, do." *Martin v. Kristensen*, 2019 UT App 127, ¶ 50, 450 P.3d 66 (cleaned up), *aff'd*, 2021 UT 17, 489 P.3d 198. "To reverse under the cumulative error doctrine, this court must determine that (1) an error occurred, (2) the error, standing alone, has a conceivable potential for harm, and (3) the cumulative effect of all the potentially harmful errors undermines its confidence in the outcome." *State v. Haynes*, 2025 UT App 75, ¶ 73, 571 P.3d 1197 (cleaned up), *cert. denied*, 578 P.3d 749 (Utah 2025).

¶53    The claims that give rise to potential prejudice were those concerning the admission of the t-shirt message and the prosecutor's references to that message. "For purposes of this analysis, we assume that each of these errors, standing alone, had a conceivable potential for harm. We next examine whether the cumulative effect of these . . . errors prejudiced" Meguerditchian. *See id.* Even without the t-shirt message and related comments, there is simply no likelihood that the jury would have acquitted him on any of the charges. The evidence in this case overwhelmingly demonstrated Meguerditchian's guilt. There was video evidence of him shooting at Carl's car, and there were multiple corroborated accounts that he participated in the kidnappings. The evidence also made clear he repeatedly lied to the police in his attempts to cover up the murder. The cumulative effect of the alleged errors simply does not undermine our confidence in the outcome since there is no reasonable probability that Meguerditchian would have been acquitted in the absence of the t-shirt message and the prosecutor's comments. The t-shirt message and the prosecutor's comments certainly didn't help Meguerditchian's defense, but that does not mean that they led to his conviction. Instead, Meguerditchian was convicted because the jury was convinced of his guilt by the vast array of other incriminating evidence. Accordingly, Meguerditchian's cumulative prejudice claim falls short.


CONCLUSION

¶54    We reject each of Meguerditchian's challenges to his convictions for murder, felony discharge of a firearm, aggravated kidnapping, and obstruction of justice. He has inadequately briefed his assertion that the district court erred in denying his directed verdict motion on the kidnapping charges, he did not receive ineffective assistance with regard to the message on his t-shirt or the admission of the body camera video, the district court did not err in declining to instruct the jury on voluntary

intoxication or mistake of fact, and the cumulative prejudice arising from the alleged errors does not undermine our confidence in the verdict rendered.

¶55   Affirmed.

———————